**Zigmund A. MILOS, individually and trading as Milos Ford Sales, Plaintiff,**

v.

**FORD MOTOR COMPANY and A. W. Kennedy Motor Company, Defendants.**

Civ. A. No. 17361.

United States District Court
W. D. Pennsylvania.

April 4, 1962.

Rosenzweig & Rosenzweig, Attys. at Law, Pittsburgh, Pa., for plaintiff.

Eckert, Seamans & Cherin, Pittsburgh, Pa., for Ford Motor Co.

Smith & Hodel, Attys. at Law, Pittsburgh, Pa., for A. W. Kennedy Motor Co.

SORG, District Judge.

This action was brought under the anti-trust laws, 15 U.S.C.A. §§ 1–7, 15 and under the Automobile Dealers' Franchise Act, 15 U.S.C.A. § 1221 et seq., claiming damages as a result of the termination of plaintiff's franchise agreement as an automobile dealer with defendant Ford Motor Company. The action under the anti-trust laws was dismissed as to both defendants at the close of plaintiff's case. The action under the Automobile Dealers' Franchise Act against defendant Ford was submitted to a jury which returned a special verdict in favor of plaintiff and found that he had sustained a loss of profits from August 11, 1958 to the date of trial in the amount of $75,600, and from the date of trial to September 30, 1962, in the amount of $19,400. The Court reserved decision on Ford's motion for a directed verdict made at the close of all the evidence and Ford now moves for judgment in accordance with its motion for a directed verdict or, in the alternative, for a new trial.

The Automobile Dealers' Franchise Act provides, in pertinent part, as follows:

1. "§ 1222. Authorization of suits against manufacturers; amount of recovery; defenses

"An automobile dealer may bring suit against any automobile manu-

facturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith."

2. "§ 1221. * * *

"(e) The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

Defendant's motion for judgment is based on the following grounds:

"1.   Upon the facts and the law, the plaintiff has shown no right to relief.

2.   There is no evidence on which the jury could find a violation of the Automobile Dealer Franchise Act of 1955, 70 Stat. 1125 (1956).

3.   Under the evidence, the defendant Ford Motor Company as a matter of law acted in good faith in complying with the provisions of the franchise and in terminating the franchise of the plaintiff.

4.   Under the evidence, as a matter of law, the plaintiff as a dealer did not act in good faith."

5.   Paragraph 5 of defendant's motion asserts that the Act is unconstitutional in that it deprives defendant of due process under the Fifth Amendment to the Constitution of the United States; that it is an unlawful delegation of legislative powers in contravention of Article I, Section 1 of the Constitution; that it is not an exercise of one of the enumerated powers vested in Congress by the Constitution, and specifically that it exceeds the power of Congress over interstate commerce under Article I, Section 8, clause 3 of the Constitution, and as such is an invasion by Congress of the powers reserved to the states under the Tenth Amendment.   Paragraph 6 asserts that permitting the jury to make an award under the evidence in this case deprives defendant of due process under the Fifth Amendment.   Paragraph 7 states that if the Act is construed to permit the jury to find liability in this case, the Act is unconstitutional as being vague, indefinite and uncertain and in failing to set forth a standard of prohibited conduct.

6.   "There is no evidence of damage in this case resulting from a violation of the Automobile Dealer Franchise Act of 1956".

THE FRANCHISE AGREEMENT

Plaintiff first became a Ford dealer under a franchise agreement with Ford dated November 30, 1955.   In 1957, Ford offered new franchise agreements, to all dealers, to be, at the dealer's option, either indefinite in duration, or for a 1 or 5 year term, but subject, in any event, to the termination provisions of the agreement.   Ford and Milos entered into the new agreement on April 1, 1957, to expire by Milos' election, on September 30, 1962.   The transmittal letter from Ford accompanying the new agreement stated, in part, as follows:

"The new agreement is intended to be prospective in effect; it does not deal with the past.   It is not intended, however, that the execution and delivery of the agreement should constitute evidence of a decision by either party to continue the relation-

ship with the other for any period of time except in accordance with the provisions of the agreement. In other words, each party may exercise at any time in the future any right granted to it or him under the new agreement and shall not be deemed to have waived or impaired such right by execution and delivery of the new agreement or by anything said or done in that connection.

Most of our Dealers have been performing satisfactorily, but there are a few whose performance and practices have been such that, if continued, would not constitute performance of their obligations under the new agreement. * * * "

By letter dated January 28, 1958, Ford gave plaintiff notice of termination of the 1957 agreement pursuant to the provisions of subparagraph 17(a) (1) of the agreement for "failure to perform your duties, obligations and responsibilities under subparagraphs 2(a) and 2(b) of the said Ford Sales Agreement." The notice subsequently became effective on August 11, 1958.

The following provisions of the April 1, 1957 Sales Agreement are pertinent here:

1. Subparagraph 17(a) (1) provides in part:

"The Company may terminate by notice given to the Dealer not less than ninety (90) days prior to the effective date of such notice in the event the Dealer shall have failed to fulfill or perform any one or more of the duties, obligations, or responsibilities undertaken by him pursuant to paragraphs 2. * * * "

2. Subparagraph 2(a) provides in part:

"Sales and Service Responsibility

"(i) Sales. The Dealer shall promote vigorously and aggressively the sale of VEHICLES at retail, and the sale of other COMPANY PRODUCTS, in the DEALER'S LOCALITY, making use to the greatest reasonable extent of the Company's advertising and sales promotions and merchandising material, and shall develop energetically and satisfactorily the potentiality for such sales and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. Whether or not the Dealer shall have vigorously and aggressively promoted such sales in the DEALER'S LOCALITY and shall have energetically and satisfactorily developed the potentiality for such sales and obtained a reasonable share thereof, shall be determined by reference to such reasonable criteria as the Company may develop from time to time including, without limitation, in the case of VEHICLES (1) the relationship of the Dealer's retail sales of VEHICLES, to users located in the DEALER'S LOCALITY to (a) the total registrations of VEHICLES in such locality, (b) the fair and reasonable retail sales objectives of VEHICLES established for the Dealer for such locality, and (c) the registrations of automobiles (or trucks) of other manufacturers selected by the Company and generally competitive with VEHICLES in price and product characteristics (hereinafter called 'Competitive vehicles') in such locality; and (2) comparison of each of the relationships referred to in the foregoing clause (1) with (a) similar relationships with respect to each of not less than three (3) other authorized Ford dealers of reasonably comparable size and located in the nearest areas of sales and service responsibility reasonably comparable to the DEALER'S LOCALITY, and (b) similar relationships with respect to the average of all authorized Ford dealers as a group in one or more of the following areas: the Company's zone sales area in which the Dealer is located; the Company's district sales area in which the Dealer is located; the Company's regional sales area in which the Dealer

is located; and the national sales area. If the Dealer is not the only authorized Ford Dealer in the DEALER'S LOCALITY, such relationships shall be determined and such comparisons shall be made in the light of the portion of the retail sales of VEHICLES in the DEALER'S LOCALITY for which the Dealer fairly may be held responsible."

3. Subparagraph 2(b) provides in part:

"Place of Business, Facilities and Equipment.

"The Dealer shall establish, maintain and equip a place or places of business in the DEALER'S LOCALITY, including a salesroom for VEHICLES, facilities for parts and accessories sales, service facilities and a used passenger automobile and truck outlet, of such lay-out, appearance and size as will enable the Dealer adequately to develop in the DEALER'S LOCALITY the good will of customers and prospective customers and their acceptance of COMPANY PRODUCTS, and to meet his sales and service responsibilities hereunder; install and maintain therein tools, machinery and equipment recommended by the Company, or of a quality and efficiency equivalent thereto, and adequate to meet the normal service requirements of owners of COMPANY PRODUCTS in the DEALER'S LOCALITY to the extent of his sales and service responsibilities hereunder; and maintain the operation of such place or places of business during and for not less than the business hours customary in the trade in the DEALER'S LOCALITY. * * *"

By letter dated April 1, 1957, Ford designated plaintiff's "Dealer's Locality" as "Pittsburgh, Pa. (A portion of Metropolitan Area)."

Provisions similar to subparagraphs 2(a) and (b) above were contained in the sales agreement of November 30, 1955. Subparagraph 11(a) provided in part that the dealer shall "Develop the sale of COMPANY PRODUCTS * * * to the satisfaction of Company. * * *" Subparagraph 11(b) provided in part that the dealer shall "Establish, maintain and equip a place or places of business, including a salesroom, service facilities and a used passenger automobile and truck outlet in a manner satisfactory to Company; * * *."

## RELATIONS BETWEEN MILOS & FORD

In order to secure better sales representation in the Oakmont-Verona Unity area of Allegheny County, Pa., in 1955 Ford decided to establish a new dealership or so-called "open point" in the area. This was the dealership subsequently awarded to plaintiff Milos. Before awarding the dealership Ford set up a "sales potential" for the "open point" of 228 new cars as a forecast of expected sales. The "sales potential" was established by a formula which determined the percentage relation between the actual car registration figures for the 3 preceding years between the postal zones of Oakmont, Verona and Unity and those of the Pittsburgh district, weighted in favor of the most recent years to reflect market trends, and allocated this percentage of the sales potential of the Pittsburgh metropolitan area to the new "open point." Plaintiff testified that he was never informed that this was the "sales potential" expected of him before his application was accepted, that he was told that the potential was "somewhat into two hundred" cars per year, and that this goal was not expected of him until he had established himself. On the other hand, Ford representatives testified that they fully explained the "sales potential" for the point to Milos before he was accepted as a dealer.

During the period when his application was pending, there were discussions between Milos and Ford representatives concerning the adequacy of the facilities with which he would begin business.

Several Ford representatives testified that they recommended his application be refused because his facilities were not adequate for the type of dealership Ford wanted to establish. In a letter to Ford dated November 22, 1955, plaintiff stated that his present facilities "are totally inadequate for proper representation of a Ford dealer", and if accepted "I agree to secure representative and suitable facilities including show-room, parts department, office and service department within a period of two (2) years from the date of my acceptance." Several Ford representatives testified that except for this letter Milos' application would not have been accepted.

As of November 30, 1955, the date of the first sales agreement, Milos' facilities consisted of a building whose dimensions were about 60 feet by 55 feet with an adjacent lot for used cars and parking. During 1956, this building was divided into a showroom, offices, parts department and service department. In 1956 a building 30 feet by 25 feet was added for use as a washroom-get-ready room and an adjacent lot 25 feet by 150 feet was purchased for use as a used-car lot. No other facilities were added after January 1, 1957.

After Milos' acceptance as a dealer, Ford assigned him a monthly "sales objective" as it did to all other dealers. The monthly "sales objective" of the individual dealer was a division of the monthly "sales objective" of the Pittsburgh metropolitan area which varied with the season, the state of the automobile market and peculiar local conditions. Each dealer's share of the monthly "sales objective" of the Pittsburgh area was based upon the ratio of his "sales potential" to the "sales potential" of the metropolitan area, with allowances made for special conditions affecting a particular dealer's business during the month. On this basis, the total of plaintiff's monthly sales objectives for 1956, as set by Ford, was 236 new cars, for 1957, 258 new cars, and for the first six months of 1958, 127 new cars. Each month the Ford Field Manager visited plaintiff's dealership to secure his new car order for the following month. He sought to secure from plaintiff a new car order in the quantity he calculated would be necessary for plaintiff to meet his sales objective for the month, taking into account his present inventory and the stock to be left in inventory at the end of the month.

Plaintiff testified that in 1956 differences of opinion arose concerning the monthly ordering of cars between himself and Ford Field Manager Heisler. In July or August of 1956, plaintiff said Heisler presented him with a new car order for 22 cars, that he felt this number exceeded what he should take as a new dealer, but that "he persuaded me in letting me feel that the number of cars wasn't more than was needed", and that he accepted the order. In September of 1956, Milos testified that Heisler insisted on a 22 car order for the next month, that he felt the order should be about half that amount, that Heisler refused to accept any other order without consulting "other authority", but that they finally "got into a gentleman's agreement of 18 cars". In November of 1956, plaintiff testified that Heisler insisted on a 20 car order for December which he refused to sign since he had 22–24 cars in stock, and that he offered to take 10 cars. Milos said Heisler would not reduce the order without calling "higher authority" at the district office, but that after a lengthy discussion of possibilities for the coming month "we did agree on a 15-car order." Milos testified that generally when Heisler came for his monthly order, the order form was already filled out as to the number of cars he should order, leaving Milos to decide, with Heisler's assistance, the various models, body styles and accessories making up the order.

In December 1956, Kellerman became the Field Manager assigned to Milos' dealership. Milos testified that Kellerman sought to sell him a package of sales promotional materials concerning the 1957 new cars. Milos claimed there were several sizes of packages graduated according to the sales volume of the dealer

and that Kellerman insisted he take a larger package than his volume of sales warranted. Milos refused to take the larger package and said that Kellerman told him he had to order the larger package and refused to sell him the smaller package.

Plaintiff testified that in March 1957 there were discussions between himself and Kellerman concerning additional facilities. Plaintiff testified he had sufficient facilities for his business at the time, that Kellerman did not specify what additional facilities were needed, and that he told Kellerman that he saw "no real need in adding more facilities at the present time."

On March 20, 1957, Milos met with Kellerman and Fitch, the Ford Assistant District Sales Manager, and discussed the same problem. Milos testified that Fitch said it would be necessary to extend his building to the alley to have an adequate facility and that the dimensions of such an addition would be 60 feet by 95 feet. Plaintiff told Fitch he would be willing to discuss a building half-way to the alley but this was not satisfactory to Fitch. Milos said he later secured an oral estimate of $50,000 as the cost of a building half-way to the alley. It is not disputed that Ford never specified what minimum standards of physical plant would be acceptable to it, nor did Milos submit any specific proposal for expansion of his facilities. On April 2, 1957, Milos wrote Fitch, in part, as follows:

"As for extending my present building facilities I fully realize that I am in need of additional room. At the present time I have a Capital Loan from Universal C I T Corporation, also a large amount unpaid on my present building, and other obligations.

"I have weighed all the facts and problems at hand with deep thought and consideration on extending my building facilities this year. But I will be unable to go into this building program at that early date be-cause of the committments [sic] that are before me at the present time."

On June 28, 1957, plaintiff again met with Fitch at the district office. Plaintiff agreed that his facilities were not adequate and stated that, because he had other liabilities, he would not be in a position to make any decision as to expansion of facilities until March of 1958.

On July 22, 1957, plaintiff met with Smith, Ford's District Sales Manager. Plaintiff told Smith he was willing to engage in a reasonable building program but that the building Smith and Kellerman had suggested was unreasonable. Plaintiff testified Smith told him this was unsatisfactory and that he would recommend to Ford that the sales agreement be terminated. After his meeting with Smith, Milos testified that Kellerman "was more in demand that I take the car order that was set up for me and no other order would be accepted," and that he "generally" would take the car order "set up" for him by Kellerman.

On July 26, 1957, Smith recommended to the Regional Sales Manager that the April 1, 1957 sales agreement with plaintiff be terminated. After consideration by the Regional Office and the General Sales Manager, the notice of termination was issued on January 28, 1958. Plaintiff had a hearing at his request before Ford's Dealer Policy Board on March 3, 1958. The Board confirmed the notice of termination by letter dated May 7, 1958. After a second meeting with the Board at plaintiff's request on July 10, 1958, the notice of termination became effective on August 11, 1958.

Under the Sales Agreement, Ford was obligated on termination to repurchase any new vehicles and parts and accessories on hand, any signs bearing the company name, special tools and mechanical equipment designed for servicing Ford products, and to give aid in disposing of or renting the dealership premises. Following termination, Ford tendered compliance with these provisions but Milos refused the tender.

## SALES IN RELATION TO POTENTIALS AND OBJECTIVES

Plaintiff's sales in comparison to the sales objectives assigned to him by Ford and with other metropolitan dealers are not in dispute. In 1956, plaintiff sold 116 new cars which was 49.2% of his total monthly sales objective of 236 cars; sales of all dealers in the zone to which he was assigned were 85.1% of total objectives; sales of all dealers in the Pittsburgh district were 93% of total objectives. In 1957, he sold 133 new cars which was 51.5% of his total monthly sales objective of 258 new cars; sales of zone dealers were 90.4% and of all district dealers 95% of total sales objectives. In the first six months of 1958, plaintiff sold 36 new cars which was 28.3% of his total sales objective of 127 new cars; sales of zone dealers were 59.8% and of all district dealers 84.3% of total objectives. Registrations of new Fords in the postal zones of Oakmont and Verona were 227 in 1956, 207 in 1957, and 70 in the first six months of 1958; no figures were available for Unity, originally included in calculating plaintiff's sales potential, but registrations there had previously averaged 18–20 new cars per year.

In 1957, as a result of a resurvey of the market in the Pittsburgh area, Ford decreased the sales potentials and sales objectives of 56% of the 27 Ford dealers in Allegheny County, and increased those of 44% of the dealers. Plaintiff's sales potential was increased from 228 cars in 1956 to 248 in 1957, and was 124 for the first six months of 1958. Defendant Kennedy, the closest Ford dealer to Milos, was located in Cheswick, about 4 miles from Milos, and customarily sold in the Oakmont area. When Milos' dealership was established, Ford reduced Kennedy's sales potential by the amount of the sales potential established for Milos,—from 391 cars in 1955 to 163 in 1956, and increased it to 208 in 1957 and 1958.

## DAMAGES

Plaintiff agreed that his only claim for damages was for loss of the profits he would have made from the operation of the franchise from August 11, 1958, the date of termination, to September 30, 1962, the date upon which the agreement would expire according to its terms. His evidence consisted of monthly financial statements submitted to Ford during the operation of his dealership and income tax returns for the years 1956 through 1960.

----------

■ Although the evidence presented, viewed in the light most favorable to the plaintiff, did establish a variation in market potentials assigned to other dealers in the area of his franchise, it fails to disclose that they were based upon any different standards than those applied to him. It further fails to disclose that any standards of performance other than those expressly adopted by the parties in Subparagraph 2(a) (i) of the Franchise Agreement (set forth at page 4 above) were applied in the establishing of his sales potential. This Court, therefore, is of the opinion that plaintiff's burden of proving a lack of good faith in the matter of allegedly discriminatory assignment of performance standards has not been met. Nor is there any evidence that Milos was coerced into accepting more inventory than his market could absorb. Indeed, his profit experience and the absence of any claim based on losses sustained in this respect compel an inference to the contrary. It is disclosed, however, by undisputed evidence, that Milos' sales performance in his thirty-one months as a Ford dealer was about 50% below the average level of performance of other dealers in the area.

In connection with plaintiff's assertion of bad faith on the part of Ford in its insistence upon expansion of facilities by Milos, the evidence is free of any substantial dispute. Although recommendations as to an additional building of a size considered unreasonable by Milos were made by a representative of Ford, neither Milos nor Ford conveyed to the other any specific proposal as to improvements contemplated by Milos or minimum requirements on the part of Ford. On

the contrary, in April, 1957, Milos refused by letter to consider any building program until at least 1958 in spite of his agreement to provide adequate facilities and his unequivocal admissions on several occasions that his facilities were inadequate. A conclusion that Ford acted in bad faith in assigning inadequate facilities as one of its reasons for termination of the franchise, considered in conjunction with Milos' record of performance is wholly unwarranted. It is also to be noted that Milos did not sustain any losses as a result of capital expenditures induced by Ford. In fact, no damages are claimed for expenditures or losses of any kind, except for anticipated profits from a continuance of the franchise. Milos agreed to stand or fall on this one element of damage, and his action resolved itself into the question of termination in bad faith rather than a course of conduct which coerced him into the sustaining of actual losses from the operation of his business.

The Automobile Dealers' Franchise Act is not a guarantee against termination of a dealer's franchise, but rather the granting of a right of action for damages as a guarantee against coercion and intimidation through conduct amounting to bad faith. As stated in the report of the Committee on the Judiciary of the House of Representatives, H.R. Rep. No. 2850, 84th Cong.2d Sess., 1956 U.S.Code, Cong. & Admin.News, Vol. 3, p. 4596 at p. 4603, "The principal effect of the bill as amended by the committee is to give the dealer a right of action against the manufacturer, where the manufacturer fails to act in a fair and equitable manner so as to guarantee the dealer freedom from coercion, intimidation, or threats of coercion or intimidation. * * * The bill, however, does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the bill curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise."

The Act is designed to correct the previously existing situation in which a dealer could be deprived of his franchise without recovery of losses of any kind. Prior to the Act, for instance, he was held to the letter of a written franchise, including the right of the manufacturer to terminate at will without regard for the losses a dealer may have sustained thereby, and whether or not he may have been induced to incur obligations and make expenditures in reliance on the franchise. Likewise, a dealer may have been coerced into accepting an unreasonably large inventory under the threat of termination of his franchise, resulting in loss to him whether or not the franchise was eventually terminated. The Act was intended to give such a dealer redress. No doubt, there are many more situations wherein a dealer may be said to sustain losses through inequitable conduct on the part of the manufacturer, and which are the target of the Act of Congress. But the history of the dealer in this case is not one of losses sustained but one of resistance and of refusal to yield to the recommendations of the manufacturer. Nor does the evidence permit an inference that losses would have been incurred had he seen fit to comply. The evidence was not sufficient to establish bad faith on the part of Ford, and the verdict in this case is a result which does not fall within the intent of the Act of Congress. The constitutional questions raised by the defendant are not reached.

An appropriate order granting defendant's motion for judgment in accordance with its motion for a directed verdict will be entered.