Zigmund A. MILOS, Individually and Trading as Milos Ford Sales, Appellant,

v.

FORD MOTOR COMPANY and A. W. Kennedy Motor Company.

No. 14118.

United States Court of Appeals Third Circuit.

Argued Jan. 25, 1963.

Decided May 24, 1963

---

Samuel M. Rosenzweig, Pittsburgh, Pa. (Aaron Rosenzweig, Robert W. Semenow, Pittsburgh, Pa., on the brief), for appellant.

Frank L. Seamans, Pittsburgh, Pa. (William H. Eckert, John H. Morgan, Robert C. McCartney, Eckert, Seamans & Cherin, Pittsburgh, Pa., Richard B. Darragh, Robert W. Scott, Harvey S. Kronfeld, Dearborn, Mich., on the brief), for Ford Motor Co.

Before STALEY and SMITH, Circuit Judges, and SHAW, District Judge.

STALEY, Circuit Judge.

Plaintiff Zigmund A. Milos appeals from a judgment of the district court entered upon its order granting defendant Ford Motor Company's motion for judgment under Rule 50, F.R.Civ.P., following a jury verdict in favor of plaintiff. Plaintiff brought suit under the Automobile Dealers Day in Court Act, 15 U.S.C.A. §§ 1221–1225, seeking damages for the termination of his franchise agreement.[1]

---

1. The complaint also averred a violation of the Anti-Trust laws, but that claim has been abandoned.

The operative facts may be summarized as follows: In 1955 Ford reviewed its sales outlets in the metropolitan area of Pittsburgh, Pennsylvania, and decided that an "open point" existed in the Oakmont-Verona section. Plaintiff applied for the new dealership, but the adequacy of his facilities was questioned by several Ford representatives. However, on November 30, 1955, shortly after plaintiff signed a commitment letter acknowledging this deficiency and promising to remedy it within two years of his acceptance by Ford,[2] the parties executed a franchise contract for an indeterminate term.

In 1956 differences arose concerning the operation of the franchise. Apparently these were centered on the sales quotas which had been assigned to Milos, although the record also indicates that there were discussions concerning the size of plaintiff's staff and the amount of promotional material which he should purchase. In March 1957, a Ford representative asked plaintiff when he intended to add facilities to his enterprise. Later that month Milos met with Fitch, Ford's assistant district sales manager, for the purpose of discussing a building program and plaintiff's sales performance. Fitch again pressed the necessity for expansion, but plaintiff stated that he was willing to discuss an addition approximately half the size of that advocated by Fitch.

On April 1, 1957, a new franchise agreement was executed, the expiration date of which was September 30, 1962. The expiration date was made subject to the termination provisions of the agreement.[3] On April 2, 1957, plaintiff wrote to Fitch acknowledging his need for additional facilities but stating that he would be unable to engage in a building program during 1957.[4] This issue was discussed again with Fitch on June 28, 1957, Milos declaring that financial difficulties precluded a decision on expansion until March 1958. Fitch then referred the matter to Smith, Ford's district sales manager.

The entire operation of the franchise was discussed at a meeting with Smith on July 22, 1957. Milos said that he was willing to engage in a reasonable building program at a later date but the size of the facilities suggested by the Ford representatives was unreasonable. Smith then wrote to Johnston, regional sales manager, on July 26, 1957, recommending termination of Milos' franchise. Johnston visited plaintiff on September 12, 1957. Subsequently, in a letter to the

---

2. The letter states:
   "The writer fully appreciates that the present facilities, under which I am now operating, are totally inadequate for proper representation of a Ford Dealer, therefore upon the acceptance of myself as a Ford Dealer by the Ford Motor Company, I agree to secure representative and suitable facilities including showroom, parts department, office and service department within a period of two (2) years from the date of my acceptance."

3. The relevant provision is paragraph 17 (a) (1), which provides in pertinent part:
   "17(a) Termination. The following provisions shall govern termination of this agreement:
   "(1) The Company may terminate by notice given to the Dealer not less than ninety (90) days prior to the effective date of such notice in the event the Dealer shall have failed to fulfill or perform any one or more of the duties,

obligations or responsibilities undertaken by him pursuant to paragraphs 2, 10, 11, 12, 13 and 15 * * *."

4. The following is a portion of that letter:
   "As for extending my present building facilities I fully realize that I am in need of additional room. At the present time I have a Capital Loan from Universal CIT Corporation, also a large amount unpaid on my present building, and other obligations.
   "I have weighed all the facts and problems at hand with deep thought and consideration on extending my building facilities this year. But I will be unable to go into this building program at that early date because of the committments [sic] that are before me at the present time.
   "I feel if the Ford Motor Company will bear with me that we can work this problem out in the near future."

general sales manager in Dearborn, Michigan, Johnston reported on his interview with Milos and forwarded the file which recommended dealer termination. The general sales office reviewed the matter, and on January 28, 1958, a termination notice was sent to Milos.[5]

At plaintiff's request a hearing was granted before defendant's Dealer Policy Board on March 3, 1958. The Board confirmed the termination by letter of May 7, 1958. A second hearing was had before the Board on July 10, 1958, but to no avail, and the termination became effective August 11, 1958. Certain benefits were offered to plaintiff on condition that he release Ford from further liability under the agreement, but Milos refused this offer and instituted the present suit.

At the outset, it should be noted that Milos admits that he did not fulfill the sales objective assigned to him. Nor is it disputed that he failed to increase his facilities in accordance with his original commitment. These were the reasons assigned by Ford for terminating his franchise. The essence of plaintiff's contention is that these sales and facilities requirements were oppressive and unreasonable, and Ford's insistence upon them constituted a failure to act in "good faith" as required by the statute.

The Act grants a dealer the right to sue for damages by reason of the failure of the manufacturer "to act in good faith in performing or complying with any of the terms or provisions of the franchise, *or in terminating*, canceling, or not renewing the franchise with said dealer \* \* \*." (Emphasis supplied.) 15 U.S.C.A. § 1222. The critical term is "good faith" which is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guar-

antee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C.A. § 1221(e). Plaintiff urges that we construe the term liberally, not confining it to acts of coercion and intimidation. As he puts it, "conduct dealing with reasonableness, fairness, justice and equity in and of themselves (without coercion) can be taken into consideration in other circumstances in determining whether or not an actionable cause arises under the Dealers Franchise Act \* \* \*."

The plain language of the statute does not warrant such an approach; the legislative history rejects it. Perhaps the most succinct and direct refutation of plaintiff's contention is found in the following excerpt from the House Report:

> "The principal effect of the bill as amended by the committee is to give the dealer a right of action against the manufacturer, where the manufacturer fails to act in a fair and equitable manner so as to guarantee the dealer freedom from coercion, intimidation, or threats of coercion or intimidation. The term 'fair and equitable' as used in the bill is qualified by the term 'so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party.' In each case arising under this bill, good faith must be determined in the context of coercion or intimidation or threats of coercion or intimidation. Each party to an automobile franchise would have a special obligation to guarantee the other party freedom from coercion or intimidation of any kind." H.R.Rep. No. 2850, 84th Cong., 2d Sess.

---

5. The notice provides in pertinent part:
    "Notice of termination, effective as hereinafter provided, is hereby given by Ford Motor Company of its Ford Sales Agreement with you dated April 1, 1957 pursuant to subparagraph 17(a) (1) of said Sales Agreement and because of your failure to perform your duties, obligations and responsibilities under subparagraphs 2(a) and 2(b) of the said Ford Sales Agreement." Subparagraphs 2(a) and 2(b) are set out infra at n. 6.

(1956), 3 U.S.Code Cong. & Adm. News pp. 4596, 4603 (1956).

The issue was again raised on the floor of the House in the following colloquy:

"Mr. Halleck. In other words, while the words 'fair and equitable' are used, speaking of the relationship between the parties, those words 'fair and equitable' would be limited, as this language is contained in the bill, to 'coercion and intimidation'?

"Mr. Celler. That is correct." 102 Cong.Rec. 14070 (1956).

Hence, it is not surprising that the cases fully support this limitation. Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425 (C.A.2, 1962); Woodard v. General Motors Corp., 298 F.2d 121 (C.A.5, 1962); Augusta Rambler Sales, Inc. v. American Motors Sales Corp., 213 F.Supp. 889 (N.D.Ga.,1963); Leach v. Ford Motor Co., 189 F.Supp. 349 (N.D.Cal., 1960); Staten Island Motors, Inc. v. American Motors Sales Corp., 169 F.Supp. 378 (D.N.J.1959). See also 70 Harv.L.Rev. 1239, 1247–1250 (1956–1957); 66 Yale L.J. 1135, 1171–1180 (1957). But see Barney Motor Sales v. Cal Sales, Inc., 178 F.Supp. 172 (S.D.Cal.1959).

Plaintiff urges that even under this construction of the Act sufficient evidence of *coercion and intimidation* was adduced to justify the jury's verdict. He prefaces this with a reminder of the limited scope of our review in cases in which the jury has returned a verdict. In support of that verdict, he asserts that Ford's termination of the contract before the ex-

piration date is prima facie evidence of a violation; that the franchise agreement reeks with unfairness and inequity; and that Ford's demands regarding his sales quotas and his facilities were oppressive and unreasonable. He particularizes his sales-performance objection by stating that his quotas were unfair as compared with those of other dealers in the area. Lastly, he advances the proposition that because the manufacturer sets the sales figures, it has the burden of proving that they are reasonable and justified.

■ The argument that termination before expiration is prima facie evidence of a violation is untenable. The Act expressly conditions recovery of damages on a failure of the manufacturer to act in good faith. Termination in itself does not suffice. As this court stated in Bateman v. Ford Motor Co., 302 F.2d 63, 66 (C.A.3, 1962): "A franchise is not a marriage for life." The following excerpt from the House Report makes that clear:

"The bill, however, does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the bill curtail the manufacturer's right to cancel or not renew an inefficient or undesirable dealer's franchise." 3 U.S.Code Cong. & Adm. News, p. 4603 (1956).

■■ The terms of the 1957 franchise agreement fail to reveal any evidence of unfairness or inequity.[6] With respect to sales quotas, the criteria pro-

6. The pertinent clauses relating to sales and facilities are subparagraphs 2(a) and 2(b), which provide in relevant part:

"2. (a) *Sales and Service Responsibility.*

"(i) *Sales.* The Dealer shall promote vigorously and aggressively the sale of VEHICLES at retail, and the sale of other COMPANY PRODUCTS, in the DEALER'S LOCALITY, making use to the greatest reasonable extent of the Company's advertising and sales promotions and merchandising material, and shall

develop energetically and satisfactorily the potentiality for such sales and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. Whether or not the Dealer shall have vigorously and aggressively promoted such sales in the DEALER'S LOCALITY and shall have energetically and satisfactorily developed the potentiality for such sales and obtained a reasonable share thereof, shall be determined by reference to such reasonable criteria as

vided in the agreement, e. g., the relationship of sales to vehicle users and the total registration of vehicles in the area, appear to be eminently reasonable, objective and nondiscriminatory. In this regard the comment of the district court in Leach v. Ford Motor Co., 189 F.Supp. at 352, is appropriate:

"Assignment of a market potential in the course of honest business judgment by a manufacturer to a dealer as a measure of expected performance within an area is not inherently unfair or arbitrary. A market potential is not a require-ment that a dealer sell a given num-ber of cars in any event. Rather, it is a percentage factor of one dealer's share of sales by many dealers in an area. * * * Only if the percentage factor for any one dealer is out of line could he be prejudiced

by the so-called market potential formula."

Having determined that the contract is not coercive as written, we now turn to the question of whether it was administered in bad faith. With respect to the adequacy of plaintiff's facilities, it will be recalled that Milos himself acknowledged this deficiency and the first franchise was granted only after he promised to remedy it within two years. Thus, this is not a case of a manufacturer who, having induced a dealer to accept a franchise and make a substantial investment, then seeks to compel him to expand his facilities. Rather, it is a case of one party to a contract freely entered into requiring the other party to perform. An attempt to enforce an unambiguous contractual obligation, under these circumstances, can hardly be said to constitute coercion or

the Company may develop from time to time including, without limitation, in the case of VEHICLES (1) the relationship of the Dealer's retail sales of VEHICLES to users located in the DEALER's LOCALITY to (a) the total registrations of VEHICLES in such locality, (b) the fair and reasonable retail sales objectives of VEHICLES established for the Dealer for such locality, and (c) the registrations of automobiles (or trucks) of other manufacturers selected by the Company and generally competitive with VEHICLES in price and product characteristics (hereinafter called 'Competitive Vehicles') in such locality; and (2) comparison of each of the relationships referred to in the foregoing clause (1) with (a) similar relationships with respect to each of not less than three (3) other authorized Ford dealers of reasonably comparable size and located in the nearest areas of sales and service responsibility reasonably comparable to the DEALER's LOCALITY, and (b) similar relationships with respect to the average of all authorized Ford dealers as a group in one or more of the following areas: the Company's zone sales area in which the Dealer is located; the Company's district sales area in which the Dealer is located; the Company's regional sales area in which the Dealer is located; and the national sales area. If the Dealer is not the only authorized Ford dealer in the DEALER's LOCALITY, such relation-

ships shall be determined and such comparisons shall be made in the light of the portion of the retail sales of VEHICLES in the DEALER's LOCALITY for which the Dealer fairly may be held responsible.

* * * * * * *

"2. (b) *Place of Business, Facilities and Equipment.* The Dealer shall establish, maintain and equip a place or places of business in the DEALER's LOCALITY, including a salesroom for VEHICLES, facilities for parts and accessories sales, service facilities and a used passenger automobile and truck outlet, of such lay-out, appearance and size as will enable the Dealer adequately to develop in the DEALER's LOCALITY the good will of customers and prospective customers and their acceptance of COMPANY PRODUCTS, and to meet his sales and service responsibilities hereunder; install and maintain therein tools, machinery and equipment recommended by the Company, or of a quality and efficiency equivalent thereto, and adequate to meet the normal service requirements of owners of COMPANY PRODUCTS in the DEALER's LOCALITY to the extent of his sales and service responsibilities hereunder; and maintain the operation of such place or places of business during and for not less than the business hours customary in the trade in the DEALER's LOCALITY. * * *"

intimidation. Woodard v. General Motors Corp., 298 F.2d at 128.

As pointed out by the district court, the undisputed evidence discloses that plaintiff's sales record was substandard, not merely in terms of the objectives assigned to him, but in comparison with the record of other dealers.[7] That evidence devitalizes the assertion of coercion, intimidation, and discrimination. However, plaintiff seeks solace in his claim that the sales quota of Kennedy, a dealer in his area, was 300 cars both before and after the existence of the Milos franchise. He also makes much of the fact that in 1957 his potential was increased, whereas that of 56 per cent of all other dealers was decreased and only 44 per cent had a quota increase.

With respect to Kennedy's quota, the record clearly discloses that it was reduced from 391 cars in 1955 to 163 in 1956, after the establishment of plaintiff's dealership. More important than this, plaintiff's arguments miss the mark, for absent a showing of discrimination or unfairness in the assignment of sales quotas, he has introduced no evidence of coercion or intimidation on this point. The adjustment of figures in 1957 proves only that in applying its sales formula for that year, Ford increased the potential of Milos along with that of 44 per cent of its dealers in the metropolitan area.

■ The contention that Ford had the burden of proving that its sales figures were reasonable is without merit. The Act conditions recovery on a failure of the manufacturer to act in good faith, and the Senate Report declares: "As in all actions under this bill, the dealer would have the burden of showing absence of good faith by the manufacturer." S. Rep. No. 2073, 84th Cong., 2d Sess. (1956). See also 102 Cong.Rec. 14071 (1956) (Remarks of Representative Celler). Moreover, even assuming the validity of plaintiff's proposition, we have previously indicated that there is nothing inherently unfair or arbitrary in the assignment of a market potential.

■ The sum of all this is that the record is devoid of any evidence which

7. The following is an excerpt from the district court's opinion:

"Plaintiff's sales in comparison to the sales objectives assigned to him by Ford and with other metropolitan dealers are not in dispute. In 1956, plaintiff sold 116 new cars which was 49.2% of his total monthly sales objective of 236 cars; sales of all dealers in the zone to which he was assigned were 85.1% of total objectives; sales of all dealers in the Pittsburgh district were 93% of total objectives. In 1957, he sold 133 new cars which was 51.5% of his total monthly sales objective of 258 new cars; sales of zone dealers were 90.4% and of all district dealers 95% of total sales objectives. In the first six months of 1958, plaintiff sold 36 new cars which was 28.3% of his total sales objective of 127 new cars; sales of zone dealers were 59.8% and of all district dealers 84.3% of total objectives. Registrations of new Fords in the postal zones of Oakmont and Verona were 227 in 1956, 207 in 1957, and 70 in the first six months of 1958; no figures were available for Unity, originally included in calculating plaintiff's sales potential, but registrations there had previously averaged 18–20 new cars per year.

\* \* \* \* \*

"Although the evidence presented, viewed in the light most favorable to the plaintiff, did establish a variation in market potentials assigned to other dealers in the area of his franchise, it fails to disclose that they were based upon any different standards than those applied to him. It further fails to disclose that any standards of performance other than those expressly adopted by the parties in Subparagraph 2(a) (i) of the Franchise Agreement \* \* \* were applied in the establishing of his sales potential. This Court, therefore, is of the opinion that plaintiff's burden of proving a lack of good faith in the matter of allegedly discriminatory assignment of performance standards has not been met. Nor is there any evidence that Milos was coerced into accepting more inventory than his market could absorb. Indeed, his profit experience and the absence of any claim based on losses sustained in this respect compel an inference to the contrary. It is disclosed, however, by undisputed evidence, that Milos' sales performance in his thirty-one months as a Ford dealer was about 50% below the average level of performance of other dealers in the area." Milos v. Ford Motor Co., 206 F. Supp. 86, 92 (W.D.Pa., 1962).

would support a jury finding that the termination of plaintiff's franchise resulted from the failure of Ford to act in "good faith" as that term is defined in the Automobile Dealers Day in Court Act.

Of course, our conclusion makes it unnecessary for us to consider Ford's alternative arguments challenging the constitutionality of the statute.

The judgment of the district court will be affirmed.