Herbert C. **SWARTZ**, Norman I. Swartz, Eleanor Lattig and Swartz Motors, a New Jersey corporation, Plaintiffs,

v.

**CHRYSLER MOTORS CORPORATION,** a Delaware corporation duly authorized to transact business in the State of New Jersey, Defendant.

Civ. A. No. 1230–68.

United States District Court
D. New Jersey,
Civil Division.

March 11, 1969.

835

Cohn & Burger, by Martin Burger, Palisades Park, N. J., for plaintiffs.

Pitney, Hardin & Kipp, by Frank C. O'Brien, Newark, N. J., for defendant.

COOLAHAN, District Judge:

This is an action in which the plaintiffs seek to require Chrysler Corporation to continue Swartz Motors as a Dodge dealer. The jurisdiction of this court is invoked under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* The case is presently before the court on plaintiffs' motion for a preliminary injunction continuing Swartz Motors' status as a Dodge dealer; a temporary restraining order to that effect was signed on November 23, 1968, and has been continued pending this decision.

■■ In order for a preliminary injunction to be issued here, the plaintiffs must prove that there is a "reasonable probability of eventual success" in the current law suit and that there is a "likelihood of irreparable injury" if the injunction is not issued. Ikirt v. Lee National Corp., 358 F.2d 726 (3d Cir. 1966). There seems little doubt that an automobile dealer will be irreparably harmed if the manufacturer which supplies its stock of cars terminates dealings with it. The

loss of identification as a Dodge dealer and the resulting monetary loss will not be easily susceptible of proof at trial. Moreover, a measurement of the momentum lost by a failure to continue Dodge advertising on a regular basis could only be based on speculation. While the complaint asks for monetary damages in the alternative, as is pointed out by the defendant, it is clear that the main relief sought in this action is the injunction requiring Chrysler to continue Swartz as a Dodge dealer. The only question remaining, therefore, is whether it is "reasonably probable" that the plaintiffs will eventually succeed in this action.[1]

Swartz Motors was begun in 1933 as a partnership consisting of the father, grandfather and uncle of the present President of the corporation, Herbert C. Swartz. From 1933 until 1955 Swartz acted as a dealer for Chrysler in both the Plymouth and Dodge lines of cars. In 1954, Mr. Herbert Swartz' father died, and, as a condition of continuing the dealership, Chrysler required that Swartz Motors incorporate and add a new shop. This was done. Then, in 1955, the Plymouth franchise was taken away, leaving Swartz with only its Dodge franchise. Finally, in 1965, Chrysler threatened to terminate the Swartz franchise if sales failed to improve, and sent in an inspector to survey the facilities of the dealer and to recommend changes. According to the uncontroverted testimony of Mr. Swartz, Swartz Motors, in order to prevent Chrysler from terminating the franchise at that time, was forced to consent to a cancellation of its permanent Direct Dealer Agreement, and to the substitution of a Term Agreement running from August 13, 1965 until June 1, 1966. On January 18, 1966, Chrysler had Swartz execute a "sales locality amendment," enlarging the territory involved in fixing the sales formula for Swartz from the immediate Dover area to the entire Newark metropolitan region, extending as far

south as New Brunswick and as far east as Jersey City.

The term agreement was renewed, after Mr. Swartz flew to Detroit to work out the terms in May of 1966, and was to run from June 1, 1966 to June 1, 1967. This first extension was itself extended, by agreement on June 1, 1967, until December 1, 1968. A clause in the original Term Agreement, which continued to be a part of the contractual arrangements of the parties through the extensions, provided that a new Direct Dealer Agreement would be granted by Chrysler if Swartz fulfilled the responsibilities set out therein. These responsibilities included: 1) increasing working capital; 2) providing monthly financial statements to Chrysler; 3) selling a sufficient number of cars and trucks "to equal or exceed" the Minimum Sales Responsibility (MSR) as defined in the Direct Dealer Agreement; and 4) "Dealer is otherwise qualified for a regular Dodge Direct Dealer Agreement." The report of Scott Smith, a Chrysler inspector, dated October 8, 1965, calls for, among other things, an improved used car display, a remodeling of the showroom, an enlarged sales force, increased advertising, and the removal of two persons then working at the dealership, Mr. and Mrs. Bruno Storck, Mr. Swartz' uncle and aunt. According to the testimony at the hearing on the peliminary injunction, all of these recommendations have been followed at great cost to the plaintiffs, but Swartz Motors has still not been able to equal or exceed its MSR. Chrysler maintains, therefore, that it has the right to refuse to allow Swartz to remain as a dealer and to refuse to sign the permanent Direct Dealer Agreement. Swartz, on the other hand, contends that the use of MSR is "unequitable, discriminatory and coercive," and that failure to meet MSR is being used as a subterfuge to cancel the dealership to allow Chrysler to establish a company-owned dealership.

1. As a result, the facts recited hereafter and the legal conclusions set forth represent only tentative conclusions reached from evidence thus far adduced in the case.

Swartz further alleges that, to further this plan, Chrysler expanded the area within which Swartz' MSR is computed, thus increasing Swartz' MSR, and reclassified Swartz' location in Dover from a "designated" to a "non-designated" area.

The Direct Dealer Agreement provides that a dealer's MSR is computed as follows:

> From time to time, but at least once a year, Dodge will compute the ratio of the number of new Dodge passenger cars or Dodge trucks, as the case may be, registered for the most recent 12-month period for which registration figures are available in the Dodge Sales Region in which Direct Dealer is located to the number of all new passenger cars or trucks, as the case may be, so registered in that Region. The ratio thus obtained will be applied to the number of all new passenger cars or trucks, as the case may be, registered during the same 12-month period in Direct Dealer's Sales Locality. The resulting number (and the percentage share of market that such number represents for the Sales Locality) will be Direct Dealer's Minimum Sales Responsibility for this same twelve (12) month period, subject to such adjustment as is described below.
>
> * * *
>
> If Direct Dealer's Sales Locality is in a metropolitan or other market area where there are located one or more authorized dealers in the passenger car or truck as to which the Minimum Sales Responsibility computation is made * * * Direct Dealer's fair share will be determined on the basis of recent trends in sales performance, availability of motor vehicles, local conditions, revisions in Direct Dealer's Sales Locality description, location of facilities, and the other factors, if any, directly affecting sales opportunity.

At the hearing, however, Jack Casement, the manager of the department of Chrysler responsible for the computation of MSR for Plymouth and Dodge and for the calculation of each dealer's Fair Share, testified that the MSR and Fair Share were arrived at somewhat differently. The truck MSR, he explained, was not computed separately; instead, the figure was taken to be the same as the passenger car MSR. He testified further that the Fair Share was established by determining the relative importance of each dealer's local market, which is measured by the number of new cars registered in what Chrysler designates as the dealer's prime trading zone and after considering the combined selling strength of all dealers, including those of other automobiles which are located in the same general "dealer cluster." Mr. Casement did not deal specifically with the facts in the Swartz' MSR assignment, but testified only as to the general method by which MSR's were assigned.

■ While the Direct Dealer Agreement also provides that

> Where appropriate, Dodge will adjust Direct Dealer's Minimum Sales Responsibility to take into account the availability of motor vehicles, local conditions, revisions in Direct Dealer's Sales Locality description, the recent trends in Direct Dealer's sales performance, and the other factors, if any, directly affecting sales opportunity.

Raymond Cox, Dodge Regional Manager for the New York Region, testified at the hearing that he had never been involved in any case in which the above paragraph was utilized during the sixteen years he has been employed in the regional office. His interpretation of the paragraph's use of the phrase "local conditions" was restricted to "a drastic situation which might adversely affect the dealer's ability to perform, such as a fire, which would have burned out his facilities." In considering whether MSR is "unequitable, discriminatory and coercive," therefore, this paragraph may be ignored.

■ Turning, then, to a consideration of the propriety of the MSR formula, its basic failure immediately becomes clear: The formula does not take into account

the socio-economic level of the particular area surrounding the dealership or use as a factor the greater or lesser degree of acceptability which Dodge automobiles have in the vicinity of the dealership. Obviously local conditions are of paramount importance in any consideration of a dealer's performance, and the responsiveness of the MSR formula to these conditions has not, at least at this stage of the proceedings, been indicated. Furthermore, the method by which Chrysler made the decision to incorporate Swartz into the Newark Region, while not incorporating its dealer in Sparta, which is in a neighboring area of the same general character as that of Dover, was not elucidated at the hearing, nor was the subjective method of Fair Sharing used in deciding Swartz' MSR. In addition, it is clear that, given the method by which MSR is calculated, approximately one-half of all Chrysler dealers would be subject to termination at any time by virtue of the MSR clause,[2] since Chrysler defines "adequate performance" as the "attainment of minimum sales responsibility * * * [a]ccomplishment would be a hundred per cent." It is evident, because nowhere near that number have been terminated, that Chrysler accepts less than 100 per cent achievement of MSR as adequate sales performance. This court agrees with Federal District Judge Will, who after a trial on the merits in Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D. Ill.1966), vac. as moot, 375 F.2d 773 (7th Cir.), stated:

> As we shall note subsequently in somewhat greater detail, Chrysler can properly waive "strict performance" of the MSR requirement and substitute a standard of conduct which accepts a lesser degree of performance as satisfactory. Having done so, however, it cannot claim the right to vary the standard of satisfactory performance between dealers so as to gain the right to terminate dealers for causes other than those enumerated in the contract, i. e., applying a more rigorous standard of satisfactory performance to one dealer because it has reasons for desiring termination, when those reasons, in and of themselves, would not constitute cause for termination under the contract. Such action is tantamount to rewriting the contract to give Chrysler the right to terminate at will which the contract —as written—precludes.

\* \* \* \* \* \*

We conclude that MSR calculated simply as provided in the Chrysler dealership agreements without adjustment for the various factors herein discussed and which results at all times in a substantial number of dealers being in technical default is an arbitrary, coercive and unfair provision since it would enable Chrysler to terminate roughly one-third to one-half of all its dealerships at any time. We conclude also that Chrysler has waived failure to achieve MSR as a default in plaintiff's dealership agreements by treating it as a performance goal rather than as a condition of those agreements.

In this court's view, it is obvious that to allow Chrysler to terminate, based solely on the use of these MSR and Fair Share figures which are computed by a division of Chrysler, would be unfair.

This is in accord with the legislative purpose behind the Automobile Dealers' Day in Court Act, which indicates that the words "fair and equitable" are to be interpreted within the context of coercion by the manufacturers, which arises from the inequality of bargaining

2. Full data on this point was not adduced at the hearing on the preliminary injunction. Plaintiffs' exhibit 10, covering the entire 1965 model year, however, shows that nine out of the thirteen dealers listed on that sheet prepared by Chrysler had failed to achieve MSR. See also Madsen v. Chrysler Corp., infra. This point, and the many others which were not elucidated at the hearing, will hopefully be clarified through the use of the expanded discovery techniques permitted by the Federal Rules of Civil Procedure, and will be further pursued at trial.

power between the oligopolistic automobile manufacturer and the local dealer who possesses little economic power. Milos v. Ford Motor Co., 317 F.2d 712, 7 A.L.R.3d 1162 (3d Cir. 1963). If the franchise of a dealer is terminated for wrongful reasons, the manufacturer is liable under the statute. Berry Brothers Buick, Inc. v. General Motors Corp., 257 F.Supp. 542 (E.D.Pa.1966), aff'd, 377 F.2d 552 (3d Cir. 1967). As the Fifth Circuit Court of Appeals has pointed out, in Woodard v. General Motors Corp., 298 F.2d 121, 127–128 (5th Cir. 1962):

> The policy behind the enactment of the Automobile Dealer Franchise Act was to establish a balance of power as between manufacturers and dealers in the automobile industry by curtailing the economic advantages of the larger manufacturers and increasing those of the dealers.
>
> \* \* \* \* \* \*
>
> [O]ne of the principal evils which the Act was designed to remove was the exertion of pressures by the dominant automobile manufacturers upon dealers to accept automobiles, parts, accessories and supplies which they neither needed nor wanted and which they felt their market would not absorb.

The insertion of the clause allowing Chrysler to terminate any dealer who falls below MSR, a figure which a very substantial number of dealers fails to meet, appears to have come about only as a result of the tremendous bargaining pressure possessed by Chrysler over its dealers, a pressure which the Act was intended to counterbalance.

None of the cases cited by the defendant is authority to the contrary. In Garvin v. American Motors Corp., 318 F.2d 518 (3d Cir. 1963), cited by defendant, the court says at p. 520:

> As we have previously noted, Garvin promised to hire at least one full-time salesman in 1958. Certainly, there is nothing arbitrary or unreasonable about this requirement. Indeed, the very purpose of the franchise was to assure the sale of automobiles. Hence, the manufacturer's insistence on the performance of this contractual commitment could not possibly be considered coercion or intimidation. Milos v. Ford Motor Co., 317 F.2d 712 (3d Cir. 1963); Woodard v. General Motors Corp., 298 F.2d 121, 128 (5th Cir. 1962).

It appears from the court's statement that where there is an arbitrary or unreasonable requirement imposed upon the dealer by an automobile manufacturer as a result of its great bargaining power, the court may intervene under the Automobile Dealers' Day in Court Act. In this instance, as noted above, all requirements insisted upon by Chrysler were complied with. The showroom was redecorated, a new used car lot was purchased, a new lighting system was installed, the amount of working capital was increased, more workers were employed, the amount of money spent on advertising was increased to a level higher than that recommended by Chrysler, and finally, Mr. and Mr. Storck, founding members of the company, were bought out at a cost of more than $50,000. As in *Madsen, supra*, 261 F.Supp. at 506:

> to permit Chrysler to terminate in reliance on plaintiffs' failure to achieve MSR would be particularly unfair here where, at Chrysler's urging, plaintiffs invested substantial funds in new sales and service facilities for the purpose of increasing sales and service volume.

To allow Chrysler to terminate Swartz' dealership in reliance on the coercive MSR clause, merely because the solutions Chrysler itself proposed are not totally effective in the Dover area, would be unfair.

The question before this court, therefore, is whether the sales record of Swartz Motors would warrant Chrysler's refusal to sign a permanent Direct Dealer Agreement.[3] The bare sales figures

---

3. While the court could simply strike the MSR clause, leaving Chrysler with no method for terminating a dealership because of poor sales performance, the court

alone, showing an increase of from 65 cars sold in 1962 to 120 cars sold in 1967[4] are not sufficient for the court to conclude that Swartz' sales performance, absent other considerations, may be considered unsatisfactory by Chrysler. The new MSR formula devised by Chrysler and computed over the entire Newark area does not seem by the court, for the reasons heretofore given, to be of much assistance. Nor, for that matter, is the old MSR formula computed only in the surrounding area, because of the inequities which necessarily inhere in any computation of MSR.[5] The court therefore is left to its own devices in deciding whether or not Swartz' performance was so unsatisfactory as to warrant Chrysler in terminating the franchise.

According to Mr. Swartz' testimony at the hearing on the preliminary injunction, which was uncontroverted by defendant's witnesses, Swartz Motors did not experience any criticism of its sales performance by Chrysler until 1963. The year 1962, the earliest year for which the court was supplied sales figures, may therefore be used as a base year in any calculations, a year in which Swartz' sales performance was considered satisfactory by Chrysler. Swartz' growth in sales must be measured against the growth experienced nationally by Dodge, which increased its share of the market from 3.43% in 1962 to 5.9% in 1967.[6] The following table indicates that Swartz' growth, extrapolating from the sales figure for 1962, has more than equaled Chrysler's nationwide percentage growth in all but 1964, the year prior to the survey prepared by Scott Smith:

| Year | Dodge % Nationwide | Cars to be Sold, Using 1962 as the Base Year | Cars actually Sold by Swartz | % by which Swartz Exceeded National Market Growth |
|---|---|---|---|---|
| 1962 | 3.43 | 65 | 65 | — |
| 1963 | 5.02 | 95 | 104 | 9% |
| 1964 | 5.74 | 109 | 105 | -4% |
| 1965 | 5.60 | 106 | 116 | 9% |
| 1966 | 6.03 | 114 | 143 | 25% |
| 1967 | 5.87 | 111 | 120 | 8% |

Thus, using the figures supplied by Chrysler, it appears that Swartz' performance is not so unsatisfactory as to permit Chrysler to refuse to sign the permanent Direct Dealer Agreement. Based on the data presented at the hear-

thinks it wiser to narrow the MSR clause to cover only cases where a dealer has an inadequate sales performance. Therefore, the adequacy of Swartz' sales performance remains an issue in the present case.

4. Final figures for 1968 were not available at the time of the hearing, although Mr. Swartz indicated that, as of December 1, 1968, 130 cars had been sold.

5. The court is especially troubled by the different results attained through the use of the varying territories used in calculating MSR. For example, under the territory used in computing the MSR for 1962, plaintiffs' attainment for 1966 was over 63%, while using the wider territory allocated in January, 1966, the attainment was only 44.4%. The court cannot understand how Chrysler can maintain that use of these territories, which brings about such different results, is equitable and based on objective factors.

6. The effective sales area of Swartz Motors was not delineated at the hearing to the satisfaction of the court, nor was the increase in the number of all cars sold to inhabitants of that area brought out. These variables are therefore ignored in the following calculation.

ing on the preliminary injunction,[7] therefore it appears to this court that there is a "reasonable probability" of plaintiff's eventual success in proving that Swartz' recent performance has been as satisfactory as, or more so than, it was in 1962, and that, therefore, Chrysler's termination, if based solely upon Swartz' sales performance, was unreasonable.

There has been some testimony here as to a possible motive for Chrysler's action in refusing to sign the permanent Direct Dealer Agreement, the proposed new factory-dealership for Mountain Lakes, New Jersey, which is located about five miles from Dover. None of the contractual arrangements between plaintiffs and the defendant permit termination in the event that Chrysler constructs such a facility. On objection, Mr. Swartz was not permitted to testify as to the date indicated on Chrysler's plans for the dealership, which Chrysler's attorney presented to the Mountain Lake's Board of Adjustment, in order to gain a zoning variance, but it is clear that, by "early 1968," according to the testimony of Dodge's Regional Manager, Mr. Cox, the dealership was already in the planning stages. Nevertheless, on February 13, 1968, Chrysler wrote to Swartz that:

The possibility of your buying out your partners whom you felt was contributing to this poor sales performance was brought up. We urge you not to delay any action that will reverse the present unacceptable sales performance record made by you.

Excluding the self-serving statement that the buy-out of Mr. and Mrs. Storck was desired by Swartz, rather than by Chrysler, a statement contradicted by the 1965 report of Chrysler's inspector, which called for their removal, it is clear that Chrysler was, at that date, still pressing Swartz to proceed with the buy-out, while knowing of the planned Mountain Lakes company-owned dealership. To permit Chrysler now to terminate under the guise of Swartz' failure to attain MSR would be unconscionable. Chrysler's motivation for refusing to reinstate the permanent Direct Dealer Agreement is further illuminated by the decision to make Dover an "open point," the effect of which is to make it impossible for Swartz to find a buyer for its dealership facilities to take over the Dodge franchise in Dover. Plaintiffs' contention that the termination was the result of other than its failure to meet MSR is further borne out by the statement of Mike McGee, Chrysler's district manager, who, Mr. Swartz testified, said that Swartz Motors' dealership would not be renewed even if it sold 600 cars, which would be far above its MSR. Mr. McGee was not called as a witness by Chrysler Corporation at the hearing. The sole testimony on this point from Chrysler was by Mr. Cox, who stated that he did not recall hearing Mr. McGee make that particular statement.

As the court noted in Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F. Supp. 453, 456 (W.D.Pa.1968):

Plaintiff's cancellation was purportedly for inadequate sales performance. * * * Testimony indicated that in fact other factors were considered by the company. Mere breach of contract by the dealer does not necessarily relieve the manufacturer of liability under the statute, whose very purpose was to afford protection against undue bargaining power on the part of the automobile makers. Furthermore, failure to meet MSR does not per se prove inadequate or unsatisfactory sales performance, in view of the criteria for determining MSR and a dealer's fair share thereof. Testimony indicates that sometimes more and sometimes less than 50% of dealers fall below the prescribed figure. See Madsen v. Chrysler Corp., 261 F.Supp. 488, 492, 506 (N.D.Ill.1967).

7. Of course, Chrysler may bring forth additional evidence at trial to convince the jury that Swartz Motors' performance was unsatisfactory, and that it exercised reasonable business judgment in terminating the franchise because of that poor sales performance.

It is a jury question whether Chrysler's action was motivated by honest business judgment or by personal animosity against plaintiff's president Samuel A. Liberto because of his prominent part in promoting opposition by privately-financed dealers to the operation of "factory-stores" or for other insufficient reasons.

Likewise, here it is a jury question whether Chrysler refused to sign the permanent Direct Dealer Agreement because in its honest business judgment Swartz Motors' sales performance was unsatisfactory or because it planned to open a company-owned dealership in Mountain Lakes.

The extensions of the Term Agreement provided that, upon fulfillment of all the conditions contained in the original Term Agreement and those contained in the extensions, Swartz would be granted a permanent Dodge Dealer Agreement. It appears to the court that plaintiffs have fulfilled all the conditions contained in all the agreements, with the exception of the MSR sales performance condition. In order for the court to grant the plaintiffs' relief, it is only necessary to find that it is reasonably probable that plaintiffs will succeed in the jury trial to follow in showing that Chrysler violated the Automobile Dealers' Day in Court Act by inserting the clause permitting termination for failure to meet MSR as a result of its superior bargaining power and coercion and intimidation of the type which the Act was meant to prevent, and then using that clause to terminate Swartz, a termination desired by Chrysler because of the planned construction of a company-owned dealership in Mountain Lakes. It appears to the court that in light of the testimony at the hearing, it is "reasonably probable" that plaintiffs will succeed in convincing a jury of these facts. The indicated relief at trial would appear to be an order requiring Chrysler to reinstate Swartz Motors' permanent Direct Dealer Agreement. A preliminary injunction requiring Chrysler to continue Swartz as a Dodge dealer pending trial is therefore warranted.

Let an appropriate order be submitted.