**STATEN ISLAND MOTORS, INC.,**
Plaintiff,

v.

**AMERICAN MOTORS SALES CORPO-RATION (New York Zone),**
Defendant.

Civ. A. No. 38-58.

United States District Court
D. New Jersey.
Jan. 21, 1959.

Saul A. Wittes, Elizabeth, N. J., by John J. Brennan, Staten Island, N. Y., for plaintiff.

Dickinson R. Debevoise, Newark, N. J., for defendant.

WORTENDYKE, District Judge.

This is a motion for summary judgment by defendant, American Motors

Sales Corporation (Sales). Plaintiff Staten Island Motors, Inc. (Motors) has brought suit against Sales as a result of the notification of Motors by Sales that its automobile distribution franchise for American Motors' automobiles would not be renewed for the year 1958. The causes of action alleged by Motors against Sales are breach of contract, violation of New York General Business Law, McKinney's Consol.Laws, c. 20, § 197, and violation of the Federal Automobile Dealers' Day in Court Act, 70 Stat. 1125 (1956), 15 U.S.C.A. §§ 1221–1225.

Sales, a Delaware corporation having its headquarters in New Jersey, is engaged in distributing cars made by American Motors Corporation, of which Sales is a wholly owned subsidiary, to franchised dealers in the New York metropolitan area. During the year 1957 Motors, a New York corporation, was one of three dealers of American Motors' automobiles on Staten Island. Since 1936 Motors had sold automobiles under franchise agreements with Sales or its predecessors. The franchise agreements between Motors and Sales were operative for one year only, a practice general in the automotive industry. Each year a new agreement would be entered into for the following year. Motors sold defendant's automobiles under one such agreement during the year 1957. This agreement had been executed by Francis De-Paolo, president and sole stockholder of Motors, and by a representative of Sales, some time in the latter part of 1956. By its terms this franchise agreement expired at the end of 1957. In October 1957, the zone manager of Sales notified DePaolo that "[a]fter much study and deliberation, we wish to advise you that we do not contemplate entering into a new Franchise Agreement with you [for 1958] at the expiration of the present agreement."

The reasons given by Sales for the non-renewal of the franchise were that plaintiff's sales for the year did not reflect the increased success of most of the other dealers in the zone in selling de-fendant's cars; that DePaolo was not personally present at its place of business during a substantial portion of the year; that when he was so absent he left the conduct of its business to his twenty-one year old daughter and nineteen year old son and one mechanic; and that plaintiff did not have a suitable place for display of defendant's automobiles.

 Motors has based its alleged cause of action for breach of contract on the fact that in September 1957, it had ordered eight 1958 Nash Rambler automobiles from Sales, which the latter did not subsequently deliver. Failure of Sales to deliver these automobiles, which is alleged to have been a breach of the franchise agreement, is claimed to have resulted in a corresponding loss of business to Motors. However, it appears that this order for cars was not placed by De-Paolo, to whom Sales looked as the key man of the corporation, and who, under the 1957 franchise agreement, was the sole qualified representative of Motors. The order was made orally by DePaolo's nineteen year old son at an automobile show in New York. DePaolo's son asked a representative of Sales to ship *any* eight new 1958 automobiles to Motors. It would take little imagination to visualize that, in a business as complex as is involved in the distribution of new automobiles, Sales would require more definite specifications before such an order could be filled, even if the order were initially made by DePaolo himself. Indeed such specificity would seem to be the reason why the franchise agreement provides that "All orders for motor vehicles shall be submitted in writing on Car Purchase Order Forms supplied by Zone." Plaintiff admits that no written forms were submitted to Sales requesting the automobiles in question, and there is no evidence before me that order forms were requested of Sales or that Motors submitted any written correspondence to Sales concerning the allegedly ordered cars. Motors cannot complain of Sales' inaction in failing to fill the order when it has not fulfilled its obligation to make such request in writing. Jones v. United

States, 1877, 96 U.S. 24, 24 L.Ed. 644; Williston, Contracts §§ 663, 672 (Rev.Ed. 1936). Plaintiff further complains that Sales breached the 1957 franchise agreement when it disseminated the information that it was not going to renew Motors' franchise for 1958. The dissemination by Sales of this information of an already existing fact to its own employees cannot be said to have caused any damages to Motors. Cf. Schwing Motor Co. v. Hudson Sales Corp., D.C.Md. 1956, 138 F.Supp. 899, affirmed 4 Cir., 239 F.2d 176, certiorari denied 1957, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38. It does appear that one prospective customer of Motors did cancel an order with Motors in favor of another dealer. However, in light of the subsequent disposition of this action, such damages as De-Paolo might there prove would be far below the jurisdictional amount which governs this Court's cognizance of contract actions based on diversity of citizenship. 28 U.S.C. § 1331 (1952). There being no other justiciable issue of fact as to the alleged breach of contract, this cause of action must be dismissed.

The second cause of action alleged by Motors arises from an alleged violation by Sales of New York General Business Law § 197, which provides: "No manufacturer or distributor, or any agent of such manufacturer or distributor, shall *terminate* any contract, agreement, or understanding or renewal thereof for the sale of new motor vehicles to a distributor or dealer, as the case may be, except for cause." (Emphasis supplied.) It is clear beyond doubt that the New York statute only covers the situation where the manufacturer *terminates* an existing contract with its franchised dealer, as compared to the Federal Day in Court Act, infra, and other similar State statutes, which cover terminations or cancellations by manufacturers of dealers' franchises and failures to renew such franchises. Brown and Conwell, Automobile Manufacturer-Dealer Legislation, 57 Col.L.Rev. 219, 224 (1957); and compare e. g. Virginia Code of 1950, § 46.1–547 (1958 Supp.) and South Dakota Code Supp. § 54.1103 (1952) to e. g. Ark.Stats. (1947), § 75–1504 (1957 Replacement) and Minn.Stat.Ann. § 168.-27, Subd. 14. The franchise agreement involved in the present case was not terminated by the letter of October 1957 from Sales to Motors. The agreement was simply allowed to expire without being succeeded by a new form of agreement for the year 1958. Plaintiff, however, contends that defendant's failure to fill his oral order for eight new automobiles constituted an implied termination of the agreement. What has been said previously concerning defendant's obligation in this regard disposes of this contention. Motor's asserted cause of action under the New York statute consequently must fail.

Motor's third alleged cause of action is predicated on the Federal Automobile Dealers Day in Court Act of 1956 supra.[1] No reported case has come

---

1. So much of the Act as is applicable herein is as follows:

"Sec. 2. An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." 15 U.S.C.A. § 1222.

"Good faith" is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C.A. § 1221(e).

to my attention which applies the term "good faith" as used in the Act to a particular set of factual circumstances. In Miller Motors v. Ford Motor Co., 4 Cir., 1958, 252 F.2d 441, 451, the issue was withdrawn from consideration by the Court. The plain meaning of the Act indicates that the restrictions which it imposes extend only to those dealings between parties wherein coercion or intimidation or threats of the same are involved. This is borne out in the legislative history. It is stated in H.R. 2850, 1956 U.S.Code, Cong., and Admin.News Vol. 3, p. 4596 at page 4603, that "The term 'fair and equitable' as used in the bill is qualified by the term 'so as to guarantee the one party freedom from coercion, intimidation or threats of coercion or intimidation from the other party.' In each case arising under this bill, good faith must be determined in the context of coercion or intimidation or threats of coercion or intimidation." See also Note, 70 Harv.L.Rev. 1239, 1249 (1957). A careful analysis of the admitted facts here presented discloses, as a matter of law, the absence of any of the prohibited acts of coercion or intimidation or threats thereof on the part of Sales.

Plaintiff first complains that Sales violated the Act and coercion was exerted on Motors by its action in withholding the automobiles which were ordered by DePaolo's son at the automobile show. The son admittedly had no authority to act on behalf of his father. What has been stated previously concerning plaintiff's non-compliance with the express terms of the franchise agreement regarding orders of new automobiles in writing disposes of this issue raised by plaintiff.

DePaolo next alleges coercion on the part of Sales when the matter of signing the 1957 franchise agreement came up between the parties in the latter part of 1956. A representative of Sales called at DePaolo's office on Staten Island and insisted that the franchise renewal had to be signed by DePaolo in New Jersey rather than in DePaolo's Staten Island office. The representative told DePaolo that, if he did not go to New Jersey, the company "would not renew the contract." DePaolo subsequently went to New Jersey to sign the contract. This is the act which DePaolo did against his will. However, the act of signing the 1957 franchise agreement in New Jersey against his will rather than in Staten Island resulted in no injury or damage to DePaolo. The agreement was the same whether the instrument was executed in Staten Island or New Jersey. DePaolo further claims that at this time he desired to obtain some relief from the terms of the agreement which required him to submit monthly financial statements to the Company. He had not fulfilled this requirement during 1956, and Sales was insistent that he comply with this provision. DePaolo states that he was told, while attempting to negotiate a modification of this provision, "This is the contract. Sign it." Even if we assume that DePaolo signed the agreement against his will and that there was coercion under the Act with respect to this particular provision concerning the monthly reports, plaintiff has failed to indicate in any way how he was damaged as a result of his compliance with the provision during the period of the 1957 agreement. Further it would appear that such terms in dealer franchises are in the ordinary course and dictated by sound business practice. See United States v. General Motors Corp., 7 Cir., 1941, 121 F.2d 376, 386, 387; Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135, 1144 (1957).

Now that the franchise has not been renewed, DePaolo claims that certain provisions of the 1957 agreement governing the obligations of Sales during the term of the agreement and also the obligations of Sales with regard to repurchase from DePaolo and delivery of new cars and equipment on hand at the date of expiration of the agreement, and a provision for reimbursement for rental of the building occupied by DePaolo are unfair and inequitable. No opinion is expressed as to the fairness of these

terms, especially the provision relating to reimbursement for leases entered into by the dealers for their premises. See Ford Motor Co. v. Kirkmyer Motor Co., 4 Cir., 1933, 65 F.2d 1001, 1005, 1006. However, the acceptance of these provisions in the 1957 agreement were not against the will of DePaolo. These provisions were not complained of nor even mentioned by DePaolo at the time of signing the 1957 franchise. Despite the age-old warning against signing a document without reading it, DePaolo did not even read the provisions of the 1957 agreement when he signed it. He further complains that a copy of the agreement was not received by him until the following March of 1957. However, it does not appear at that time that he undertook to read the terms of his contract nor to complain of the provisions. What does appear is that apparently after DePaolo found the franchise was not to be renewed, he for the first time and with the aid of his attorney picked out and listed those provisions of the 1957 agreement which he now claims are burdensome. If we accept the common definition of coercion to be "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done" Webster's International Dictionary (2d Ed. 1936), we see that as to these criticized provisions DePaolo was not coerced. As he did not even trouble himself to familiarize himself with such provisions at the time of signing the contract, it cannot be said he was constrained to sign the contract and accept these provisions against his will.

■ One last point must be considered, i. e., whether under the Act Sales acted without coercion or intimidation or threats thereof in failing to renew Motors' franchise for 1958. If DePaolo had alleged that he resisted pressure of any sort by Sales and this resulted in the non-renewal of his franchise, he would spell out a good cause of action under the Act. H.R. 2850, 1956 U.S.Code, Cong. and Admin.News, supra, at page 4603. However, it is uncontradicted that during the last half of 1957 defendant's representatives never saw or were able to communicate with DePaolo personally on his premises. Under such circumstances they could hardly have threatened to coerce or intimidate him. Indeed, the fact that Sales' representatives could not even communicate a simple business request to DePaolo, their franchised dealer, for several months, was one of the reasons for discontinuing the relationship. Sales in no way attempted to force Motors to accept automobiles, parts, accessories or supplies it did not want, or could not dispose of on the market, on pain of non-renewal of its franchise. Cf. Ford Motor Co. v. United States, 1948, 335 U.S. 303, 316–318, 69 S.Ct. 93, 93 L.Ed. 24. Certainly a manufacturer has the right to expect its dealer to provide a suitable outlet for its products. If the dealer fails in this respect he must suffer the consequence that the manufacturer will prefer to channel his products through another more acceptable outlet. The Act clearly "does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the [Act] curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise," nor "freeze present channels or methods of automobile distribution." H.R. 2850, 1956 U.S.Code, Cong. and Admin. News, supra, at page 4603. DePaolo cannot allow his business, for which he was solely responsible, to be conducted by persons who had not reached majority, and then seek relief under the Act when the manufacturer decides that such conduct affords inadequate representation for his product. Indeed, in cases brought under the Federal Anti-Trust Laws, of which the Act is a supplement, 70 Stat. 1125, the manufacturer does not violate the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, when he cuts off the franchise of a dealer who is admittedly doing a good business selling the manufacturer's autos. Packard Motor Car Co. v. Webster Motor Car

Co.; 1957, 100 U.S.App.D.C. 161, 243 F.2d 418, certiorari denied 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38; Schwing Motor Co. v. Hudson Sales Corp., supra. In this connection the Act (15 U.S.C.A. § 1224) further provides that "no provision of this chapter shall repeal, modify, or supercede, directly or indirectly, any provision of the anti-trust laws of the United States." The asserted third cause of action of Motors under the Dealers' Day in Court Act, supra, must fail.

Defendant has further raised the questions of the constitutionality of the New York and Federal statutes. In the light of the foregoing views, I do not reach these questions.

An order may be presented in accordance with this opinion.