**Raleigh R. LEACH et al., Plaintiffs,**

v.

**FORD MOTOR CO., a corporation, et al., Defendants.**

**Civ. No. 37927.**

United States District Court
N. D. California, S. D.

Nov. 1, 1960.

1. References are to Federal Rules Civil Procedure, 28 U.S.C.

Julian Caplan, San Francisco, Cal., Clifton Hildebrand, Hildebrand, Bills & McLeod, Oakland, Cal., for plaintiff.

Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant.

SWEIGERT, District Judge.

In this case the defendant Ford Motor Company has made a motion to dismiss under two rules of this Court, Rule 41 (b) and Rule 50(a), 28 U.S.C.A. The Court has had this motion under submission since the completion of the plaintiff's presentation of its case.

The Automobile Dealers' Franchise Act, under which this case is brought, 15 U.S.C.A. §§ 1221–1225, provides in substance, Sec. 1222, that an automobile dealer may bring suit against any automobile manufacturer engaged in commerce in any district court of the United States for the failure of the automobile manufacturer from and after the passage of the Act, which was the year 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating the franchise of the dealer.

Section 1221 defines good faith as the duty of each party to the franchise to act in a fair and equitable manner toward each other so as to guarantee the other party freedom from coercion, intimidation, or threats of coercion and intimidation.

This section of the law, however, explicitly provides that recommendation, endorsement, exposition, persuasion, urging and argument shall not be deemed to constitute a lack of good faith.

In the consideration of these motions, and of the evidence before the Court, the Court has read the comparatively few cases that have come before the courts under the Act: Staten Island Motors, Inc. v. American Motors Sales Corp., D.C.N.J.1959, 169 F.Supp. 378; Pinney & Topliff v. Chrysler Corp., D.C.S.D. Cal.1959, 176 F.Supp. 801; General Motors Corp. v. Blevins, D.C., 144 F.Supp. 381; Blenke Bros. Motors, Inc. v. Chrysler Corp., D.C.Ill.1960, 189 F.Supp. 420.

In each case arising under this Act good faith must be determined in a context of coercion or intimidation, Staten Island Motors v. American Motors Sales, above cited; and Pinney v. Chrysler Corporation, above cited.

It is likewise true, however, that in evry case arising under this Act, which is primarily grounded on bad faith, any coercion or threats of coercion must be determined in a context of bad faith.

A basic allegation of Leach Company, the plaintiff in this action, is that in 1947, one Mieger, a Ford Company representative, had inquired of Leach Company concerning a partnership, which was refused, and that thereafter in the years 1946 to 1952, the so-called "sellers market", Leach Company was made a victim of unfair and discriminatory allotment of hard-to-get new cars.

Although all of this allegedly occurred many years prior to 1956, the effective year of the Automobile Dealers' Franchise Act, Leach Company was permitted to introduce evidence thereof to show a possible motivation for alleged acts of coercion by Ford Company in the years 1957 and 1958 and the eventual termination of the Leach Company franchise; also to substantiate, if possible, the allegation of Leach Company that discrimination against it in allotment of new cars in the earlier period precluded its accumulation of a sufficiently large "customer list" for valuable use in the later so-called "buyers market" from 1953 on.

Plaintiff, however, has failed to introduce any evidence sufficient to raise a reasonable inference that the so-called Mieger incident of 1947 to 1949 had any connection with the alleged acts of coercion by Ford Motor Company nearly 10 years later, nor has Leach Company introduced any evidence sufficient to support its allegation that it was in fact discriminated against in the years 1946 to 1952 with respect to the allotment of new cars.

The only evidence in this latter connection is that some other dealers in the area were allotted more cars than Leach

Company, a fact which is not disputed by Ford Company. The evidence does show, however, without conflict, that Leach Company, in each of the years 1946 to 1952 received, not a smaller but a higher percentage of the cars allotted to East Bay Metropolitan Area dealers than it was thereafter expected to sell under market potentials assigned to it for the years 1954–1958. There is no evidence that would support a reasonable inference that, in relation to the situations of other dealers in the area, the allotments of new cars to Leach Company in 1946–1952 were in any respect discriminatory. On the contrary, statistical charts received in evidence, pursuant to stipulation of the parties, indicate that the allotments to Leach Company were fairly related to those of other dealers according to the historic basis of actual sales by dealers in the last pre-war year, 1941.

In any event, a finding that Leach Company was a victim of any substantial discrimination in this respect in the years 1946–1952, would have to rest upon nothing more than speculation.

A basic allegation, therefore, on which Leach Company seeks to show bad faith and explain its admitted failure to measure up to its assigned market potentials, in the so-called "buyers market" years—1954, 1955, 1956, 1957 and 1958—falls for lack of evidence.

There is no evidence in this case to support a reasonable inference that the market potentials assigned by Ford Company to Leach Company during these years 1954–1958, as its expected share of the so-called East Bay multiple point area were unreasonable, unrealistic or coercive.

The evidence fails to show that any specific complaint was ever made by Leach Company concerning them. The statistical evidence shows that, on a population basis, the market potential of Leach Company was fairly related to those of other dealers in the area. When Leach Company claimed that its immediate trade area had deteriorated as a source for sales of new Ford cars by asserting in general terms what it considered to be an influx of low income groups, Ford Company had a test made of the area and found, according to stipulated evidence, that over 600 Fords had actually been sold in the immediate trade area of Leach Company within the test period and that Leach Company had made only 19% of such sales.

Further, the evidence is uncontradicted that in early 1957, when the Leach market potential of 4.57% (that is, of an estimated 8,750 sales in the area for the year) indicated a market potential of 400 cars a year (about 33 per month), Leach Company was asking Ford Company for 35 to 40 cars per month which, if averaged, would work out to 420 to 480 cars a year—more than its assigned market potential.

Assignment of a market potential in the course of honest business judgment by a manufacturer to a dealer as a measure of expected performance within an area is not inherently unfair or arbitrary. A market potential is not a requirement that a dealer sell a given number of cars in any event. Rather, it is a percentage factor of one dealer's share of sales by many dealers in an area. Although it is based at the beginning of any year upon "expected" sales during that year, it is subject to correction during the year by reference to "actual" sales made by all dealers in the area. Only if the percentage factor for any one dealer is out of line could he be prejudiced by the so-called market potential formula.

As already pointed out, there is no evidence here which would support a reasonable inference that the percentage factor of expected sales in the multiple point area assigned to Leach Company by Ford Company as a reasonable measure of its performance of its share of sales, was unreasonable, unfair or coercive. Such a finding would have to rest upon speculation rather than substantial evidence.

■ Upon this state of the record the case of Leach Company has in effect, and by necessity, narrowed down to its al-

legation that in 1957 and 1958, Ford Company was guilty of bad faith and coercion in presenting to it, and urging a so-called stair step plan which involved increase of salesmen from 8 to 9 and later to 11 salesmen, and a stepping up of the sales objective of Leach Company from 32 cars in January 1957 to an eventual 44 cars in June.

Leach Company refused to commit itself to the objectives of this stair step plan, claiming that it was not reasonable or safely attainable. This was the right of Leach Company.

As previously noted, however, Leach Company did impliedly acknowledge the reasonableness of at least 35 to 40 cars a month by making requests for cars in that amount at the very time this stair step plan was under consideration.

Further, the evidence shows that Leach Company acquiesced in the proposal for additional salesmen but without commitment to any given number or any given timetable.

After June, 1957, Ford Company again proposed and urged a commitment to the objectives of a stair step plan with similar reaction on the part of Leach Company. Ford Company advised Leach Company that, if it did not so commit itself to these objectives, Ford would regard it as a failure to cooperate and would report the matter for consideration of the termination of the dealership.

Ford Company, however, did not at any time presume to actually allot cars to Leach Company at any given rate or insist that it accept and pay for cars upon threat of termination in the event of its failure to do so. The proposals were at all times made in terms of stepped-up sales "objectives" to be attained by increase of sales force and, other sales aids proposed and furnished by Ford.

The question is whether this state of the record presents evidence upon which the fact finder could draw a reasonable inference of bad faith and coercion on the part of Ford Company within the meaning of the Automobile Dealers Franchise Act.

To answer the question, the Court must bear in mind that the record consists, not only of testimony concerning the so-called stair step plan—mainly the testimony of Raleigh Leach and his two sons in the business, Russell and Eugene Leach—but also of other testimony and considerable documentary and statistical evidence introduced either by plaintiff or by the defendant in the course of cross-examination, or pursuant to stipulation of the parties.

The testimony concerning the stair step plan must be viewed, not in detachment from this other evidence, but in the light of it to determine whether the evidence as a whole is such as could support a reasonable inference of bad faith or coercion on the part of Ford Company.

The evidence concerning the so-called stair step plan must be considered in the light of the admitted fact that Leach Company had continuously, through 1954, 1955 and 1956, fallen from 20% to 30% below its assigned market potential within the multiple point district; also in the light of the failure of Leach Company to meet its burden of proving, by evidence sufficient to support a reasonable inference, that its assigned market potential for these years was unreasonable, unrealistic or coercive.

The testimony concerning the so-called stair step plan does not support a reasonable inference that Ford Company, in urging it, was abrogating or increasing the basic market potential then assigned to Leach Company—4.57% of sales in the multiple point area. This market potential factor, applied to 1957 total "expected" sales in the area, worked out for Leach Company to 400 cars a year, an average of 33 cars a month. With respect to "actual" sales in 1957, it worked out to 454 cars, an average of 38 per month. Similarly applied for the so-called recession year, 1958, it worked out to 311 cars for the year, an average of 26 per month.

Continuously, from the year 1954 up through and including the year 1958,

Leach Company sold 20 to 30% below these assigned market potentials.

The evidence concerning the stair step plan must be considered also in the light of the fact that, notwithstanding the failure of Leach Company to meet its market potentials for the years 1954, 1955 and 1956, Ford Company had renewed its franchise in April, 1957, reduced its assigned market potential from 4.70%, as in the previous three years, to 4.57 for the years 1957, 1958 and 1959. It was not until early in 1957 that the so-called stair step plan was presented to Leach Company.

This evidence, considered as a whole, is insufficient to support any reasonable inference that the presentation and the urging of this plan by Ford Company was in bad faith and in effect coercion. On the contrary, the only reasonable inference from the evidence as a whole is that it was, as described in the ultimate Ford Report Recommending Termination, a "rehabilitation" plan recommended to Leach Company to remedy the dealers' failures to reach objectives and to remedy its profit condition.

The Automobile Dealers Franchise Act expressly preserves to the manufacturer the right to resort to recommendation, endorsement, exposition, persuasion, urging and argument, and provides that these things in themselves shall not be considered bad faith.

The evidence, considered as a whole, shows that the eventual termination of the franchise by Ford Company was essentially based, not upon the refusal of the dealer to commit himself to the stair step plan, but upon the ground that the dealer had not for a period of five years measured up to its assigned market potentials, which we assume, in the absence of sufficient evidence to the contrary, to have been reasonable, and upon the ground that Leach Company was not providing Ford Company with what in its business judgment it considered as adequate representation in the area.

The mere fact that Ford Company met the refusal of the dealer at this point to commit itself to the objectives of this stair step plan with statements to the effect that refusal would be regarded as lack of cooperation and would be reported as such for consideration of the termination of his franchise is not, in itself, either bad faith or coercion.

Certainly, the Ford Company had a right to consider termination and to terminate, if in good faith and without coercion, it concluded that its dealer had not been providing and would not provide it with adequate representation as measured by assigned market potentials in the area.

■ It could not have been the intent of the Automobile Dealers Franchise Act that a manufacturer should never in advance of termination indicate to a dealer its dissatisfaction with the dealer's representation over a long period and its intention to consider termination—especially where the dealer, steadfastly refusing to commit himself to the objectives of rehabilitation plans, continues to steadily and substantially fall below a market potential which has not been proven by any substantial evidence to have been unreasonable or coercive.

To construe the Act as requiring a manufacturer to effect termination, if it so chooses, without previous notice to the dealer, or opportunity to consider his situation, would be to make the Act a snare for the dealer rather than a protection.

Further, even if the presentation of the stair step plan to Leach Company was couched in terms of urging or argument, or, if we assume, contrary to what was the reasonable inference from this record, that it was couched in terms of coercion, or threat thereof, the evidence could not possibly support a reasonable inference that such presentation was made in a context of bad faith as clearly required by the Act.

On the contrary, the only reasonable inference is that it was presented as a means of assistance to a dealer, who had steadily fallen below reasonably expected performance, and as a means of avoiding, rather than furthering, any termination of its franchise.

In Staten Island Motors, Inc. v. American Motors Sales Corporation, above cited, the Court said, referring to this particular Act [169 F.Supp. 383]:

"Certainly a manufacturer has a right to expect its dealer to provide a suitable outlet for its products. If the dealer fails in this respect he must suffer the consequence that the manufacturer will prefer to channel its products through another more acceptable outlet. The Act clearly 'does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the [Act] curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise,' nor 'freeze present channels or methods of automobile distribution'."

For the reasons which the Court has stated, and upon the evidence presented by the plaintiff, and upon the motions of defendants to dismiss under Rule 41(b) and Rule 50(a), the Court has concluded that there is no sufficient evidence in this record upon which the jury could reasonably infer that the Ford Company was guilty of bad faith and coercion within the meaning of the Automobile Dealers Franchise Act of 1956, and that any finding to that effect would be based, not upon substantial evidence, but on mere speculation.

These comments apply to both counts of the complaint, the first count being based on the statute and the second being based on alleged breach of an implied provision of the franchise that any termination would be in good faith.

It would be futile to take these motions under submission and to require defendant to proceed with its evidence. The motions made by the defendant, and directed to the state of the evidence at this time, would still be before the Court. The Court must assume that the plaintiffs have had all of the opportunities that the law provides to discover and use any evidence within the control of the Ford Company and that they have done so.

For these reasons the defendant's motions to dismiss are granted, the jury is discharged, and it is hereby ordered that judgment be entered for defendant, with costs, upon both counts of the complaint.