**BURGIN MOTOR COMPANY, INC., Plaintiff,**

v.

**AMERICAN MOTORS SALES CORPORATION, Defendant.**

**Civ. A. No. 77–676.**

United States District Court,
D. South Carolina,
Greenville Division.

April 3, 1978.

C. Carlyle Steele of Warder & Steele, Greenville, S. C., for plaintiff.

Wesley M. Walker and R. Frank Plaxco of Leatherwood, Walker, Todd & Mann, Greenville, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

HEMPHILL, District Judge.

In this action, the plaintiff, an automobile dealership in Greenville, South Carolina, has instituted a suit for damages against the defendant, under the provisions of 15 U.S.C. § 1222.[1] At the outset of the case, tried without a jury in Greenville, South Carolina, on March 23, 1978, the plaintiff stated that its cause of action was pitched under 15 U.S.C. § 1221(e),[2] on a claim that the defendant, a corporation, had failed to act in good faith in failing to renew plaintiff's contract with defendant. The Court has considered the testimony, the depositions offered, the various exhibits, the pleadings, the arguments and memoranda of counsel for both parties and, pursuant to Rule 52, Federal Rules of Civil Procedure, upon the credible evidence before it, publishes the following:

### FINDINGS OF FACT

1. Plaintiff is a South Carolina corporation engaged in business in Greenville,

---

1. 15 U.S.C. § 1222 provides: Authorization of suits against manufacturers; amount of recovery; defenses.

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

2. 15 U.S.C. § 1221(e) provides:

The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

South Carolina, as an automobile dealer. Defendant is the sales subsidiary of American Motors Corporation and is an "automobile manufacturer" within the definition of 15 U.S.C. § 1221(a).[3] Burgin was an automobile dealer for American from July 3, 1958, through and including May 10, 1976, under successive Franchise Agreements. Originally, the franchise applied to the sale of AMC automobiles, but commencing April 21, 1970, plaintiff also became a franchise dealer for Jeep vehicles, originally through a franchise with Kaiser Jeep Sales Corporation, and later through a franchise with American after it acquired Kaiser. The most recent Agreement between the plaintiff and defendant covered both AMC and Jeep vehicles under a single Dealer Franchise Agreement.

2. The most recent Franchise Agreement ran from May 11, 1974, through May 10, 1976. At the time this Agreement expired, negotiations between the parties were in process, and American did not take any action to terminate Burgin as a dealer until July of 1976. By letter from T. F. Kessler, defendant's Franchise Review Manager (a part of the market representation department), dated July 26, 1976,[4] Burgin was advised that it would be terminated as a dealer for American, effective October 29, 1976. Plaintiff's claim is that this termination was due to defendant's insistence that plaintiff agree to a Sales Planning Potential, which plaintiff could not do because (a) plaintiff could not sell the number of automobiles which defendant required to be sold, and (b) plaintiff did not have the brick, mortar and lot facilities sufficient to accomplish the sales potential. Defendant pled, first, a failure to state a claim upon which relief could be granted and, second, a general denial of the allegations of the plaintiff's Complaint.

3. William C. Burgin, who testified that he was the sole owner, manager, and person in charge of plaintiff corporation, related his long association with American Motors, commencing in 1958, and his supplementary intake of the Jeep line in 1970. He testified that in June of 1976 some man, whom he could not identify, whom he did not know, whose name he could not give, and whom he had never seen before, but who, he insisted, was with defendant, brought to Burgin a contract renewal of the franchise, and insisted on a planning potential quota of 529 cars and 225 Jeeps. Burgin told the man that this was a drastic change in the quota,[5] that plaintiff could not sell that many vehicles, and further, that his location at 842 Buncombe Street, Greenville, South Carolina, a facility built in 1921, did not have enough square feet to accommodate the cars since it was already cramped under a quota of 390 cars, and that he could not possibly meet the quota. He later testified that he talked to a Mr. Richardson (whom he was able to identify) in July, that Richardson came with the contract, that it was the same contract that had been presented

---

3. 15 U.S.C. § 1221(a) provides: Definitions
As used in this chapter—
(a) The term 'automobile manufacturer' shall mean any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles.

4. This letter read in part as follows:
Our Atlanta Zone Office informed us of their efforts since May 10, 1976, to refranchise Burgin Motor Company, Inc. D/B/A Burgin AMC/Jeep. You have repeatedly refused to commit to make available the loaner car provided for under the Buyer Protection Plan as Required by the Franchise Agreement.

For this reason, American Motors Sales Corporation assumes that you are rejecting the Franchise Agreement that has been tendered to you since you have advised us in advance that you do not intend to honor its requirements. To assist you in an orderly termination of business relationships, we will continue, for the next 90 days, to sell you motor vehicles, parts, and accessories, honor warranty claims, and to provide you with the service we provide all franchise dealers. The effective date of termination will be October 29, 1976.
(This letter was introduced as plaintiff's Exhibit No. 19)

5. The actual number was 525 American Motor cars and 219 Jeeps; this was agreed to by stipulation.

before, and that he told Richardson, "There is no way I can meet my planning potential." Burgin said that such a market potential did not exist, but that Richardson insisted that it did, and Richardson said that in order to be an AMC dealer, Burgin had to sign the contract. (Richardson was the Operations Manager of the Atlanta Zone.) Burgin also testified that Richardson came back two or three weeks later, in late July or early August, that Richardson never would let him see the entire contract, and that he only saw the front page which had the planning potential on it, but Burgin said he knew that it was a two or three year contract. He said that he and Richardson had a three-hour discussion, and went to lunch, but that after lunch he told Richardson he could not sign the contract, whereupon Richardson left, but later came back and told him, "You sign today, or we cancel the franchise." Burgin received plaintiff's Exhibit No. 19, dated July 26, 1976,[6] some week or ten days after his talk with Richardson. Burgin's testimony was unsupported and uncorroborated as to most of the facts above, and the credible evidence reveals that the conversations with representatives of defendant were not as represented by Burgin. Perhaps his memory is short, or enthusiasm, or emotion, has awarded him with hazy recollection.

4. Throughout his testimony, Burgin denied that his lack of participation in what was known as the "loaner car program" was the cause of the cancellation of the contract. He testified that he had joined the loaner car program in 1971, but that on October 8, 1975, he typed underneath a bulletin from defendant, "I resign from the loaner car program," and that he thereafter refused to participate in the program. He stated that he had instituted his own loaner car program, and that the reason he resigned from defendant's program, and refused to renew it, was that he was required to furnish a new or recent (within a year) car to the customer. (Under the program, a customer received a loaner car free when he brought his new car in for repairs, and did not get the car back at the end of the day, thus becoming deprived of the vehicle's use.) Burgin stated that he was running a loaner car program of his own, not connected with defendant's program, for which he made no charge to the customer. He testified that he showed Richardson the cancellation letter, but that Richardson said that they had cancelled the contract because of his failure to go along with the Sales Planning Potential program, and that he had never discussed the loaner car program with any other representative of the defendant; that Richardson did not attempt a renegotiation of the contract; that Richardson came back in September or October of 1976 and asked if he was ready to go along and he said he was not; that Richardson left after five minutes; and, that he, Burgin, did not go along with the program because he could not sign and survive. Burgin's testimony that the loaner car program was not the problem with the renewal of his franchise was not corroborated in any way, but, to the contrary, was determined to be erroneous and incredible. This Court, sitting as Court and jury, has carefully explored the facts; and, the credible testimony, together with the documentation introduced into the record, convinces this Court that the loaner car program was discussed with Burgin by many of the defendant's representatives, including Richardson.

5. It is uncontradicted that on the 11th day of May, 1974, plaintiff and defendant entered into what is known as a Dealer Franchise Agreement, Paragraph 5 of which provided a continuation until May 10, 1976.[7] This contract provided for certain obligations on the part of the parties, including, but not limited to:

13. Sales Performance

American shall establish a sales planning potential for Dealer's market area and advise Dealer of same. Dealer shall be responsible for developing sufficient sales volume to reach such sales planning potential. Dealer's sales performance

---

**6.** See footnote 4, supra.

**7.** This was introduced directly without objection as defendant's Exhibit No. 1.

shall be evaluated on the basis of comparison of Dealer's actual sales of new Motor Vehicles to such sales planning potential.

17. Service to Owners and Users

To maintain the good will of owners and users of Manufacturer's Products, Dealer shall provide prompt, efficient and courteous service, including service to which a purchaser of Manufacturer's Products from any authorized Dealer may be entitled. Such service shall also include performance by Dealer of the following obligations:

(a) Before delivery of any new Motor Vehicle, Dealer shall perform the predelivery services and adjustments prescribed by American and then in effect.

(b) Dealer shall deliver to each owner who purchases a new Motor Vehicle from Dealer at retail such owner's manuals and service policies as may then be in effect. Dealer shall perform all services to be performed by Dealer under any such manuals and policies in accordance with procedures from time to time specified by American.

(c) Dealer shall perform campaign inspections and corrections for owners and users of all Motor Vehicles that qualify for such inspections and corrections, without regard to their origin of purchase, in accordance with procedures from time to time specified by American.

20. Right to Require Compliance and Performance and Good Faith Acts

Dealer acknowledges the right of American to insist upon full compliance with and full performance of each and all of the duties, obligations and responsibilities of Dealer under this Agreement, and failure by Dealer to fulfill or perform any of the same shall constitute a material breach of this Agreement. Dealer agrees that American's insistence upon such compliance or performance, or American's termination of this Agreement, or American's refusal to enter into a new Agreement, when there is a reasonable basis for believing that Dealer has failed to comply with or perform any of the same, shall not be deemed to be, or claimed by Dealer to constitute a lack of good faith or threats or acts of coercion or intimidation by American.

6. In furtherance of the contract, defendant furnished plaintiff a Dealer Management Manual [8] in which American Motors, to gain consumer approval, projected its "Buyer Protection Plan," to go into effect in 1971 or 1972. This plan included the loaner car program and, admittedly, plaintiff was in the program until he resigned from it at the end of 1975.[9] In the program the defendant represented to the purchaser of a new car:

A Loaner Car When You Need It. Free. Not only do we offer you a strong guarantee and a thoroughly-checked car by the factory and your dealer, we've set up a system to back it up without inconveniencing you.

If your car needs Guarantee repair work, and "same-day" (morning to evening) service cannot be completed, your participating dealer will provide you with a free loaner car for overnight use and until your car is ready (you should comply with your dealer's work schedule). A nice, clean, well-equipped car in good condition. Free.

7. In his testimony, Burgin said he would not say "yes" or "no" whether the loaner car program was part of the buyer protection plan, but he admitted that the plan went into effect in 1971 or 1972, and that the exhibit which explained the plan outlined the dealer protection plan insofar as the loaner car program was concerned. There is no doubt that plaintiff was asked to participate in the loaner car program as a dealer, and that in 1971, he had signed the "Letter of Agreement For Service Loaner

---

8. Defendant's Exhibit 5 through 5(e). (Copyright 1973).

9. Defendant's Exhibit 4, Dealer Bulletin # 75–168, dated October 8, 1975, the subject of which was: 1976 Loaner Car Quotas and Payments. Plaintiff's allocation was 3. On the bottom of this Bulletin, plaintiff typed "This will serve as our regsigination [sic] from the loaner car program." and signed W. C. Burgin.

Car Participation," which read in part as follows: [10]

. . . . .

I will purchase 3 "qualified" service loaner cars. American Motors will pay me $275.00 for each car purchased under the program and will support the service loaner program by national advertising. I will receive, free of charge, a sign identifying this dealership as a participating American Motors Service Loaner Center. My obligation under this program is to provide to the owners of New American Motors cars requiring guarantee service a loaner car in good condition in accordance with the terms of the program. The vehicles used as loaners need not be the cars on which loaner allowances were paid but must meet the specifications established by American Motors. I will maintain such records as may be reasonably required by American Motors in connection with this program.

. . . . .

I understand that because of the tie-in with national advertising and other representations made by the company that this program cannot be canceled by me and that my obligations in this regard are incorporated in paragraph 21 of the Franchise Agreement.

It appears beyond question that this program, and the failure of plaintiff's total participation in the Buyer Protection Plan, was the bone of contention about which the renewal of the contract revolved.

8. Although the plaintiff was insistent that the Buyer Protection Plan and the Loaner Car Program was not the cause of difference between the parties, the credible evidence affirmatively showed that this was the case. Defendant introduced a plethora of verbal evidence and supporting documentary evidence to show that, beginning in 1975, it had attempted to persuade the plaintiff to make available the Loaner Car Program, provided for under the Buyer

Protection Plan, as required by the Franchise Agreement.[11] Defendant's Exhibit No. 9 consists of a series of documents, not disputed, which contain what are known as "contact reports," in which the defendant, through various representatives, urged upon plaintiff his participation in this program, which defendant believed was vital to its customer relations, including, but not limited to, the following:

(a) On August 20, 1975, L. Mesh, a Dealer Service Representative, contacted Burgin and noted on his contact report (which was stamped with the dealer's stamp to show that the representative had been to the dealer, and showed the time involved) "Customer's car bursted block—engine B.O. Mills. Dealer would not loan her a car. I discussed this with him. I told him he had signed up on the program, but he said he had signed up but this was in 1973 and would not go along with 1975 program."

(b) On January 6, 1976, Mesh again contacted Burgin and reported: "Mr. Burgin refused to order any material for the S.P.P. program—stateing [sic] that he would wait and see if the program would work. . . ."

(c) On March 10, 1976, J. E. Greene, a Sales Representative, called on plaintiff and noted: "Have discussed program with Mr. Burgin & pointed out advantages, but he still declines to enroll. Attached is AMC check for $825.00 which Mr. Burgin will not accept."

(d) On May 19, 1976, he was contacted by a Sales Representative who reported: "Contacted Mr. Burgin in the absence of a District Manager to complete the refranchising package.

Reviewed all documents with Mr. Burgin required for signature. Mr. Burgin refused to sign any documents claiming that his planning potential had been changed without any prior notification."

10. Plaintiff's Exhibit No. 3.

11. Burgin claims he did not recall all of these contacts but it is obvious that he was contacted

because he did not get up and reply and dispute the fact that his dealer's number was on many of the reports.

(e) On June 4, 1976, he was again contacted by Mesh who reported: "Completed and enclosed. I discussed the Loaner Car Program but Mr. Burgin had refused all year. Mr. Manley said that they loaned cars out all of the time without the Loaner Program. . . ."

(f) On June 14, 1976, Mesh made another contact and wrote in connection with Loaner Car Program: "I discussed the program with Mr. Burgin and tried to get him to sign up but he told me that he knew the program very well and that he wanted no part of it and that he had sent our checks back. . . ."

(g) On June 15, 1976, Mesh again contacted him in connection with the Loaner Car Program and reported: "Mr. Burgin was out—no one knew where he had gone—I left and drove to Greer and made a dealer contact. I then returned back to Burgin and waited until 5:30—he didn't show up. I came back again on 18th. I met Mr. Burgin. I told him the seriousness of the loaner car program and that he had better give it some serious thinking . . . .. I feel he will sign up. . . ."

9. Not only did Mesh contact him, but John C. Bird, Atlanta Zone Manager, testified that he contacted Burgin in the Spring of 1976, when he drove down with Bob Weldon, the District Manager, and that Burgin would not participate in the Loaner Car Program. The Loaner Car Program was a part of the major thrust of the American Motors as being a corporation that was consumer oriented. They were publicizing their "excellent warranty," and commenced the Loaner Car Program as a part of that warranty. Bird initially believed that Burgin would sign, and so he contacted his superiors and told them not to act on an existing recommendation not to review the franchise. The record shows that Philip Richardson, the Zone Operations Manager, responsible for directing and coordinating the normal business of the Atlanta Zone, recommended cancellation of the Burgin franchise on December 23, 1975, in language which included: [12]

Finally, and most important, the dealer will not participate in the Loaner Car portion of the Buyer Protection Plan.

Thereafter, however, Richardson was of the impression that Burgin would sign, and they withdrew the proposal not to renew. Nevertheless, finally, after many persuasions, on July 21, 1976, Bird of Atlanta wrote to Semann of Detroit urging the cancellation and non-renewal of the franchise. As late as the 16th of July, 1976, Richardson had called Burgin and had asked to come from Atlanta to Greenville to see him, but although Burgin told him to come on up, he also told Richardson that he would be wasting his time. All of the defendant's witnesses testified positively to the efforts to get the plaintiff to renew, but without success. While plaintiff denied any recollection of this, defendant's evidence was corroborated and credible.

10. Read into the record was the deposition of David L. Zemke, who was known as "Director of Dealer Investment," and who was in the Atlanta Zone as Zone Manager during the year 1975, when an effort was being made to push the Loaner Car Program. The following from his deposition is of interest:

Q. I'll ask you if, as a part of the warranty furnished to new car purchasers of American products, there was a provision known as the service loaner provision of the car warranty?

A. Yes sir.

Q. In the parlance that American uses, was there a name for the overall warranty that related to new cars?

A. Yes, buyer protection plan.

Q. Exhibit 5 which has previously been marked consists of a loose leaf notebook that is called "Buyer Protection Plan Dealer Management Manual". Can you identify that as a manual that sets out the provisions of the buyer protection plan?

A. Yes sir.

12. Defendant's Exhibit No. 7B.

Q. Would one of those manuals have been furnished to all the dealers, including Burgin?

A. I would think so, yes.

Q. I presume that this plan went into effect prior to your taking over as the zone manager, so that you would not have been involved in seeing that Mr. Burgin got his copy of that manual, is that right?

A. That's correct. [pp. 6 and 7]

\* \* \* \* \* \*

Q. Yes. In reading a portion of paragraph 6, I note that a portion of the warranty says that if your car needs guaranty repair work and same day (morning to evening service) cannot be completed, your participating dealer, and participating there is italicized, is that correct?

A. Yes sir.

Q. . . . will provide you with a free loaner car for overnight use and until your car is ready. Do you find that language?

A. Yes sir.

Q. Now, with reference to the line of cars, the 1974 warranty, Exhibit 6–B, do you find the same language?

A. I found paragraph 6 here, yes.

Q. It refers again to a car being furnished by your participating dealer, is that correct?

A. Yes sir.

Q. And, then, referring to the 1975 warranty which is given to customers, Exhibit 6–C and again paragraph 6, do you find that same language?

A. Yes sir.

Q. Now, starting with the 1976 line of cars, continuing through the 1978 line of cars, Exhibits 6–D through 6–E, do you find in paragraph 3 the provision with reference to a loaner car?

A. Yes, it says, loaner car. [pp. 8 and 9]

\* \* \* \* \* \*

Q. Following the response by Burgin as noted on the bottom of the dealer bulletin, Exhibit 4, indicating resignation from the loaner car program, were steps taken to be in touch with Burgin in connection with the problems that created?

A. Yes sir.

Q. Can you tell me what steps were taken?

A. It seems to me that a couple of members of the service department contacted Mr. Burgin. I know I talked to him on the phone a couple of times, I think. I know Phil Richardson who was the operations manager in the zone at that time, made a trip, I'm sure, maybe two, up to see Mr. Burgin about signing on the loaner car program. So, yes we had contact.

Q. Were you successful in getting him to sign up?

A. No sir, not by the time I left the zone. [p. 14]

11. This Court finds as a fact from the credible testimony, in its entirety, that there was a bona fide difference between plaintiff and defendant as to the loaner car program, and that this was the paramount difficulty between them, not the sales planning potential. The failure to comply with the contract and continue the loaner car program did not cause the cancellation of the contract, but it prevented its renewal. The loaner car program was a significant program, and this Court finds no evidence that defendant failed to act in good faith. .

## CONCLUSIONS OF LAW

A. This Court has jurisdiction of the parties and the subject matter of the action by virtue of the statutes hereinabove referred to.

■ B. Title 15, United States Code, § 1222 creates a cause of action against a manufacturer for its failure to act in good faith in terminating, canceling, or not renewing a franchise with a dealer. Under 15 U.S.C. § 1221, good faith means:

The duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee one party freedom from coercion, intimidation or threats of coercion or in-

timidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

The statutory definition of good faith is said to be literally (not liberally) applied. In *Southern Rambler Sales, Inc. v. American Motors Corporation,* 375 F.2d 932 (5th Cir. 1967), the Court recognized that a valid contract may be an engine of oppression, but that the act requires more than unfair or inequitable conduct on the part of the manufacturer; the dealer must show coercive and intimidating effects from the manufacturer's conduct in order to make out the claim of a failure of good faith. Upon the authority of *Victory Motors of Savannah v. Chrysler Motors Corporation,* 357 F.2d 429 (5th Cir. 1966), the Court noted that the exaction of minimum sales is not violative of the Act.

C. Neither is the failure of a dealer to make timely delivery a violation of the Act, nor the furnishing of an undesirable mix of colors and models; [13] nor the furnishing of a higher percentage of cars than those allotted.[14]

D. In *McGeorge Car Company, Inc. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 55–56 (4th Cir. 1974), the Fourth Circuit observed that "good faith . . . has been construed literally by the Courts and must be determined in the context of actual or threatened coercion or intimidation." The Court also noted in that case that:

"'Franchise is not a marriage for life'," and the Act does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation or *who refuses to carry out its legitimate marketing policies.* (Emphasis added.)

The Court there held that the manufacturer's terminating, because of the dealer's refusal to take on a second line of automobiles, did not support a claim, in view of the

conclusion that the manufacturer acted in the reasonable belief that its business welfare required the dual-dealership arrangement.

The *McGeorge* case is of particular significance because the manufacturer was exonerated from liability in connection with its refusal to renew the franchise, even though liability was found in connection with earlier coercive conduct. The evidence tended to show that the manufacturer had "shorted" the dealer in the delivery of a line of automobiles in an attempt to compel the dealer to accept additional lines; and that, subsequently, the manufacturer had declined to renew the franchise upon its termination. The Court of Appeals affirmed the District Court's finding of liability in connection with the earlier "shorting" of automobiles, agreeing that this was a bad faith act of coercion. However, in reversing the award for failure to renew the franchise, the Court said:

The plaintiff contends, however, that Leyland's conduct in its efforts to coerce McGeorge in the 1969–70 period fatally infected its 1970 decision to transfer the dual line to another dealer. To accept this charge of continuing bad faith, however, would permanently preclude Leyland from making any change in its marketing procedures at any time in the future and, in effect, the bond between dealer and manufacturer would be indissoluble. (504 F.2d at 56)

The decisions are practically unanimous that lack of good faith must be accompanied by coercion, intimidation, or threats. In *Globe Motors, Inc. v. Studebaker Packard Corporation,* 328 F.2d 645 (3d Cir. 1964), the Court rejected the argument that "lack of good faith" should be literally construed and not confined and not confined to the context of coercion and intimidation. In *Milos v. Ford Motor Company,* 317 F.2d 712 (3d Cir. 1963), the Court answered the argument that the term "lack of good faith"

---

13. *Augusta Rambler Sales, Inc. v. American Motors Sales Corporation,* 213 F.Supp. 889 (N.D.Ga.1963).

14. *Leach v. Ford Motor Company,* 189 F.Supp. 349 (N.D.Cal.1960).

should be given a liberal construction (and not be confined to acts of coercion and intimidation), and that "conduct dealing with reasonableness, fairness, justice and equity in and of themselves (without coercion) can be taken into consideration," by stating that, "The plain language of the statute does not warrant such an approach; the legislative history rejects it." 317 F.2d at 715. Reference was made to the House Report (H.R.Rep.No.2850, 84th Cong.2d Sess. 1956), which states:

In each case arising under this Bill, good faith must be determined in the context of coercion or intimidation or threats of coercion and intimidation. 3 U.S.Code Cong. & Adm.News, p. 4603 (1956).

In the present case, the credible evidence establishes that defendant acted in the reasonable belief that its business welfare required its dealers to adhere to the warranties supplied to its customers. The evidence further directs the conclusion that defendant acted in the reasonable belief that its business welfare required sales objectives, and a uniform allocation of those objectives among the several market areas of the nation.

The parties stipulated that defendant, from time to time, set national sale objectives, or "planning potentials," which were based upon industry-wide new car sales; and, that it allocated this planning potential according to a consistent formula throughout various market areas of the nation. These quotas are treated in the Franchise Agreement. Paragraph 13 of the Dealer Franchise Provisions provides that:

American shall establish sales planning potential for Dealer's market area and advise Dealer of Same. Dealer shall be responsible for developing sufficient sales volume to reach such sales planning potential. Dealer's sales performance shall be evaluated on the basis of comparison of Dealer's actual sales of new Motor Vehicles to such sales planning potential.

There can be no doubt that a manufacturer is entitled to exercise its business judgment in determining sales objectives and in assigning those objectives among its dealers. In Leach v. Ford Motor Company, 189 F.Supp. 349, 352 (N.D.Cal.1960), the Court noted:

Assignment of a market potential in the course of honest business judgment by a manufacturer to a dealer as a measure of expected performance within an area is not inherently unfair or arbitrary.

And in Milos, supra, the Court rejected the proposition that since the manufacturer sets the sales figures, it should have the burden of proving that they are reasonable and justified, holding that there is nothing inherently unfair or arbitrary in the assignment of market potential or in fixing sales objectives. In Milos, the manufacturer had adjusted sale quotas, increasing the sales potential for the dealer in question, together with the quotas of 44% of its dealers in a particular metropolitan area. To the same effect is Frank Chevrolet Company v. General Motors Corporation, 419 F.2d 1054 (6th Cir. 1969), in which the right of the manufacturer to terminate because of unsatisfactory sale performance was sustained. And in Victory Motors of Savannah, Inc. v. Chrysler Motors Corporation, supra, the Court affirmed a directed verdict for the manufacturer for cancellation of the franchise because of the dealer's failure to meet minimum sales fixed by the manufacturer according to a formula, holding that the fixing of minimum sales responsibility quotas was not coercive.

The undisputed evidence shows that Burgin's sale performance was lower than the planning potential which had been assigned through an application of the national formula. (This had been a matter of considerable discussion in 1974, but it was not given as a basis for termination in 1976.)

A part of the larger picture is whether defendant, in designing its national sales strategy, and its national warranty, could make an exception in the case of one dealer and there discriminate against all other dealers in the nation. Obviously, that would have been inconsistent with defendant's national advertising, and it might quickly have results in a claim of false advertising or possibly, claims of discrimi-

natory practices under the Robinson-Patman Act or the Federal Trade Commission Act.

While this Court has not reviewed a case dealing with the refusal of a dealer to agree to comply with the manufacturer's warranty requirements, it is obvious that the remedial Act was not intended to usurp the right of a manufacturer to exercise its business judgment in adopting requirements for its dealers. See *Globe Motors, Inc. v. Studebaker Packard Corporation, supra,* upholding the manufacturer's right to require reasonable working capital of its dealers; *Frank Chevrolet Company v. General Motors Corporation, supra; Victory Motors of Savannah, Inc. v. Chrysler Motors Corporation, supra,* upholding the right to set sales requirements; and *McGeorge Car Company, Inc. v. Leyland Motor Sales, Inc., supra,* upholding the right not to renew with a dealer refusing to take on additional lines of cars.

In *Garvin v. American Motors Sales Corporation,* 318 F.2d 518 (3d Cir. 1963), involving non-renewal for failure to meet a requisite percentage of planning potential, failure to maintain sufficient working capital, and other marketing and service failures, an award in favor of the dealer was reversed on appeal. The Court cited *Woodard v. General Motors Corporation,* 298 F.2d 121, 128 (5th Cir. 1962):

> An automobile manufacturer is not precluded by the Act from including in its contracts with dealers, as the appellee has done here, requirements that dealers shall provide product representation commensurate with the good will attached to its trade name and facilitate the proper sale and servicing of its motor vehicles. The manufacturer is entitled to bargain for the protection of its good name, to provide for the trade acceptance of its wares, and to have a responsible expectation that those who are marketing its cars have the facilities for coping with the sales efforts of those who are dealing in the products of competitors.

To deny the manufacturer the right to fix the warranty flowing to the purchaser would be to invite utter chaos. It would mean that the purchaser, in fact, had no consistent warranty setting out nationwide terms on which he could rely, and it would result in the manufacturer being completely hamstrung in adopting a national advertising and marketing strategy.

### CONCLUSION

The credible evidence plainly demonstrates that defendant's controlling reason for not renewing was Burgin's refusal to agree to abide by warranty provisions provided to all new car buyers. Defendant was entitled to exercise its business judgment in framing that warranty and its national advertising. Burgin's refusal left defendant no choice. The termination was made only after defendant had exhausted its efforts to persuade Burgin to provide the service called for by that warranty. Under these circumstances, defendant cannot be said to have acted in bad faith through coercion or intimidation, and its non-renewal was entirely proper.

Judgment should be entered for the defendant, and

IT IS SO ORDERED.